**UNITED STATES of America,**

v.

**Gregory Kirt RUFF.**

**No. CR. 97–172–N.**

United States District Court,
M.D. Alabama,
Northern Division.

March 20, 1998.

Laura F. Wright, U.S. Attorney's Office, Montgomery, AL, for U.S.

Christine A. Freeman, Federal Defender, Montgomery, AL, for Gregory Kirt Ruff.

## ORDER

MYRON H. THOMPSON, Chief Judge.

Defendant Gregory Kirt Ruff pleaded guilty to one count of violating 18 U.S.C.A. § 2115, for breaking into a United States Post Office in Ramer, Alabama, with the intent to commit larceny, specifically the theft of three United States Postal money orders. Ruff is now before the court for sentencing; he has moved for a two-level downward departure pursuant to 18 U.S.C.A. § 3553(b), which permits district courts to depart downward to address circumstances "of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission," and for an imposition of a sentence of probation. The government opposes the motion. For the reasons that follow, the court will grant Ruff's motion, albeit only to the extent of a one-level departure.

### I.

On April 17, 1997, Ruff broke into the Post Office in Ramer, Alabama, and stole three United States Postal money orders with a total value of $580.00. Following a Postal Inspection Service investigation, Ruff was named in a four-count indictment on August 19, 1997. Count one charged him with violating § 2115 (for breaking and entering, and taking the three money orders), and counts two through four charged him with violating 18 U.S.C.A. § 500 (possession of the stolen money orders). Ruff pled guilty to the first count of the indictment on October 21, 1997, pursuant to an agreement with the government. The plea agreement contained the following relevant terms: (1) that, in exchange for his plea of guilty to count one of the indictment, the government would move to dismiss the remaining counts; (2) that the government knew of no reason Ruff could not receive a two-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1; and (3) that, if Ruff's sentence under the United States Sentencing Commission's Guidelines Manual (the "Sentencing Guidelines") fell within Zone B of the sentencing table, the government would recommend a sentence of home detention in lieu of imprisonment.[1] In a written statement regarding his acceptance of responsibility for the crime, Ruff stated:

"This act was very wrong on my part and I am very sorry I did it. It is just at that time I was afraid if I did not pay my car bill, they were going to take my car. They had called me at work and told me to have the money there, but I messed up and spent my paycheck on drugs, so I was really desperate. I used the money orders I took from the Post Office to pay on my car and to buy more drugs."[2]

The probation officer filed a presentence investigation report with the court on January 5, 1998. The probation officer determined that, under the Sentencing Guidelines, Ruff had a total offense level of 10 and a criminal history category of II. The officer also determined that the applicable sentencing range, contained in Zone C of the sentencing table, was 8–14 months. U.S.S.G. Ch. 5, Pt. A (sentencing table). The sentencing options available in Zone C are imprisonment, or imprisonment for at least one-half of the minimum term, plus supervised release with a condition that substitutes community confinement or home detention for imprisonment for the other half of the imprisonment term. U.S.S.G. § 5C1.1(d)(2).

The probation officer recommended that Ruff receive a sentence of 12 months of incarceration. This recommendation was based, in part, on the fact that Ruff had absconded from a probation officer's supervision in connection with a burglary charge from 1983; a warrant is still pending for his arrest regarding the remaining term of probation, and any outstanding restitution. Neither the government nor Ruff filed objections to the presentence investigation report. On February 11, 1998, two days prior to the sentencing hearing, Ruff filed the instant motion for a two-level downward departure.

In his motion, Ruff argues that the following circumstances, considered separately or combined, warrant a two-level downward departure: (1) Ruff's vulnerability to victimiza-

---

1. Plea agreement, filed October 21, 1997.

2. Presentence investigation report, at 5.

tion due to his personal history and personal characteristics; (2) Ruff's history of depression; (3) Ruff's drug addiction and efforts at drug rehabilitation; (4) his history of childhood abuse; and (5) his present medical and rehabilitation needs for his HIV-positive status, depression, and drug rehabilitation. In support of his motion, Ruff filed copies of his medical records, including the report of a psychological evaluation performed by Dr. Guy J. Renfro. At the sentencing hearing held on February 13, 1998, the court heard testimony from Dr. Renfro concerning his assessment of Ruff, including what he considered to be Ruff's heightened vulnerability to sexual abuse. The court also heard testimony from Stanford Robinson, an employee of the Federal Bureau of Prisons, concerning the availability of programs in federal prison to suit Ruff's medical needs. Based on the above described evidence, the court makes the following factual findings regarding Ruff's personal characteristics and background.

Ruff is a 35-year-old man of slight build: he is 5' 5" tall and weighs 115 pounds.[3] He is openly gay and, according to Dr. Renfro's report, displays "somewhat effeminate mannerisms."[4] In fact, Ruff performed as a female impersonator for several years in Atlanta, Georgia.[5] Ruff is also a survivor of childhood sexual abuse.[6] According to Dr. Renfro, Ruff's experiences with childhood sexual abuse render him more likely to be a victim of sexual assault. As Dr. Renfro states in his report: "He is at high risk to act out in a sexual manner, particularly when he is experiencing tension or stress. He appears to be an individual who places himself in high risk situations where he can sometimes show mastery by preventing sexual abuse from occurring while at other times he will fail and again be the victim of some form of sexual abuse. *This behavior is a form of counter phobic behavior commonly found in survivors of childhood sexual abuse.*"[7]

There is some evidence to indicate that indeed, Ruff has been sexually assaulted as an adult, both by his intimate partners as well as strangers.[8] During his testimony, Dr. Renfro explained 'counter phobic' behavior as follows: "Counter phobic behavior occurs with some victims of sexual abuse in that they have a fearful situation or stimulus. But instead of avoiding it, which would be regular phobic behavior, they actually approach dangerous behavior and seek out situations that are potentially dangerous and then try to master them.... Unfortunately, even if they engage in this a hundred times and are successful ninety-nine, they still are abused, or they still are victimized one time. So it puts them at high risk to possibly be abused."

Dr. Renfro's evaluation concluded that Ruff's personal characteristics—in particular, his counter phobic behavior, small stature, and effeminate appearance—rendered him more vulnerable for victimization in prison: "It would be important for Mr. Ruff to be placed in an environment where he can receive these treatment services while at the same time being protected from possible exploitation or victimization by other elements of the prison population. Given his small stature, effeminate appearance, and prior history of victimization, Mr. Ruff would have to be considered at very high risk for future sexual victimization by others."[9] Indeed, Ruff's history of incarceration bears this theory out: the parties have stipulated that while he was an inmate at the Montgomery

---

3. Presentence investigation report, at 11.

4. Notice of Exhibits, filed February 11, 1998, exhibit 2: Outpatient Forensic Evaluation Report of Dr. Guy J. Renfro, Ph.D., at 4 ("Renfro report").

5. Presentence investigation report, at 10.

6. Renfro report, at 3, 7; Presentence investigation report, at 10. According to these documents, as well as Ruff's declaration, when Ruff was three or four years old, he was forced to perform oral sex on his uncle and his uncle's friends several times a week. He was also sexually assaulted by an older schoolmate when he was in grade school and was frequently taunted by him and other schoolmates.

7. Renfro report, at 7 (emphasis added).

8. *Id.* at 3. As discussed *infra,* the parties have stipulated that Ruff was sexually assaulted while incarcerated in the Montgomery County Detention Center.

9. *Id.* at 8.

County Detention Center, he was sexually assaulted by another inmate.

Perhaps as a result of, or compounded by, his history of sexual abuse, Ruff also suffers from severe depression. He was admitted to the psychiatric unit of Jackson Hospital in Montgomery, Alabama, on May 23, 1997, after consuming kerosene in a suicide attempt. There, he was diagnosed by the attending physician as suffering from major depression, "which is recurrent, severe with psychosis" and was prescribed antidepressants and mood-stabilizers before being transferred to the Montgomery Area Mental Health Crisis Stabilization Unit at Greil Hospital.[10] Besides the May 23 suicide attempt, Ruff has attempted suicide on several other occasions.[11] In response to the court's question during the sentencing hearing whether, if not adequately treated, Ruff's depression could become more severe, Dr. Renfro answered in the affirmative.

Ruff's mental health has also been affected by his HIV-positive status and his drug and alcohol use. Ruff tested HIV-positive in 1984 or 1985.[12] He has not followed a steady treatment plan regarding his HIV-status; his T-cell count is low, and he is therefore extremely susceptible to infectious diseases and possibly developing the symptoms of full-blown AIDS. At the sentencing hearing, Dr. Renfro testified that it was his belief that Ruff had not fully dealt with the fact of being HIV-positive, and that his HIV-positive status could play a role in his counter phobic behavior: "Whether it's getting involved with people who may also have HIV-positive status or maybe not taking care of himself as well as he should have. Having his blood work monitored and complying with medi-

cation ... I think that is a form of the counter phobic behavior. Maybe I can beat this on my own without following through with the treatment kind of thing." One way that Ruff has attempted to cope with his depression, his history of sexual assault, and his HIV-positive status, is to abuse alcohol and drugs, specifically crack cocaine. Ruff has been using alcohol and cocaine for at least eight to ten years; both the Jackson Hospital medical personnel and Dr. Renfro diagnosed him with severe dependence on cocaine and alcohol.[13] Dr. Renfro testified at the sentencing hearing that Ruff's use of drugs and alcohol was a form of self-medication to deal with his depression: "I do believe he is one of those individuals that we call dual diagnosis, that has a long history of depression as well as substance abuse and may have been medicating himself with the cocaine and the alcohol and some of the sexual relationships he's had ... to alleviate his depressive symptoms." Ruff has completed his first attempt at drug rehabilitation at an in-patient facility (a 28–day residential program) and is currently enrolled in a daily outpatient program.

To bolster his argument that he is more likely to be susceptible to sexual assault in prison, Ruff has cited two law review articles that discuss the prevalence of sexual abuse in prisons, as well as the typical victims of such abuse.[14] In addition to these two articles, numerous other sources, including judicial opinions, establish not only the unconscionable commonality of sexual violence in this nation's prisons, but also the heightened risks facing an inmate with Ruff's personal characteristics. "The horrors experienced by many young inmates, particularly those

---

10. Notice of Exhibits, filed February 11, 1998, exhibit 3: Jackson Hospital Records, dated May 23, 1997 ("Jackson records").

11. *Id.* ("He has multiple, previous suicide attempts. He has tried to hang himself. He has tried to suffocate himself. He has tried to cut himself with razor blades.").

12. Renfro report, at 3.

13. *Id.* at 6; Jackson records, at 4.

14. Motion for downward departure, filed February 11, 1998, at 4 (citing Marjorie Rifkin, *Farmer*

*v. Brennan: Spotlight on an Obvious Risk of Rape in a Hidden World*, 26 Colum.Hum.Rts.L.Rev. 273, 276, 278, & n. 24 (1995) ("[B]rutal assault and homosexual rape are facts of daily life in men's prisons.... Correctional administrators have long recognized that prisoners likely to be victimized are overwhelmingly young first offenders of slight build with passive, soft-spoken personalities.") (collecting cases describing characteristics of inmates prone to sexual abuse); Jeff Potts, *American Penal Institutions and Two Alternative Proposals for Punishment*, 34 S.Tex.L.Rev. 443, 470–72 (1993) (citing statistics concerning inmate-on-inmate sexual assault, noting effects of rape and the groups of inmates who are more at risk for rape).

who ... are convicted of nonviolent offenses, border on the unimaginable. Prison rape not only threatens the lives of those who fall prey to their aggressors, but is potentially devastating to the human spirit. Shame, depression, and a shattering loss of self-esteem, accompany the perpetual terror the victim thereafter must endure." *Farmer v. Brennan*, 511 U.S. 825, 853 & n.*, 114 S.Ct. 1970, 1987, & n.*, 128 L.Ed.2d 811 (1994) (Blackmun, J., concurring) (citing some of the "[n]umerous court opinions [that] document the pervasive violence among inmates in our state and federal prisons."); *see also* David M. Siegal, *Rape in Prison and AIDS: A Challenge for the Eighth Amendment Framework of Wilson v. Seiter*, 44 Stan. L.Rev. 1541, 1544 (1992) ("Homosexual rape within male prisons occurs with frightening frequency and brutality.") (citing studies and statistics); Charles M. Sennott, *Prison's Hidden Terror*, Boston Globe, May 1, 1994, at B1 (stating that in American prisons "rape is an entrenched culture tacitly accepted by much of the criminal justice system" and noting that there are 200,000 to 300,000 sexual assaults each year on the 1.3 million male inmates in American prisons). Indeed, the problems of sexual violence at one correctional facility led the Eleventh Circuit to affirm an order of injunctive relief in the form of mandatory training for prison guards on handling rape complaints, special training for psychiatric staff on dealing with trauma stemming from inmate rape, and the promulgation of an official referral procedure for inmate rape victims. *See LaMarca v. Turner*, 995 F.2d 1526, 1544 (11th Cir.1993), *cert. denied*, 510 U.S. 1164, 114 S.Ct. 1189, 127 L.Ed.2d 539 (1994).

None of these allegations concerning the prevalence of sexual assault in prison, or the likelihood of Ruff being assaulted in prison, was refuted by the testimony of the Bureau of Prisons official Robinson. Robinson did testify that he did not think individuals who either suffered from AIDS, had a history of childhood sexual abuse, or led a homosexual lifestyle, would be singled out as "particular-ly vulnerable" in an inmate population; however, Robinson did not state his opinion as to the likelihood of victimization of an inmate who, like Ruff, has all three characteristics in addition to an effeminate appearance. Further, when asked by the defendant's counsel whether the Bureau of Prisons recognized the risk of sexual assault within its inmate population, Robinson answered in the affirmative. He also acknowledged that the Bureau of Prisons has not eliminated sexual assault as a risk to inmates within its population.

Robinson did testify as to the adequacy of federal prisons, particularly those institutions in Lexington, Kentucky, Springfield, Missouri, Rochester, Minnesota, Butner, North Carolina, and Fort Worth, Texas, to treat prisoners who are HIV-positive or have AIDS. He stated that these institutions have advanced medical technology, such as the latest drug cocktails, to treat prisoners who suffer from AIDS. He also testified that some of the institutions, such as Lexington, have a residential drug program that lasts for approximately nine months. However, Robinson acknowledged that there are waiting lists for such programs, but that inmates who receive sentence reductions in exchange for participation in the program would receive priority over other inmates. Without such priority on the list, Robinson stated that an inmate could wait between three weeks and over one year before commencing treatment in the program.[15]

After hearing the testimony and reviewing the submitted documents, the court is able to draw two conclusions. The first is that Ruff's physical and mental well-being are both on the precipice of collapse. Physically, he is acutely vulnerable to infectious diseases, he is vulnerable to sexual assault and victimization, as well as to a potential relapse into drug and alcohol addiction. In terms of his mental condition, as both Dr. Renfro and the consulting physicians at Jackson Hospital have concluded, Ruff needs intensive therapy to deal not only with his issues of childhood

---

15. Robinson indicated that this court could order Ruff's immediate placement within a drug treatment program, and distinguished such an order from the usual sentencing course by which the court makes a recommendation to the Bureau of Prisons. The court is unaware of, and neither Robinson nor the government could point to, any authority on which the court could base such an order.

sexual abuse, but also his HIV-positive status, his drug and alcohol problem, and most importantly, his depression. Combined, these factors strongly suggest that Ruff be monitored so as to prevent future harm to himself. This conclusion is important not so much for its effect on Ruff's motion for a downward departure, but rather as it relates to the length and type of sentence the court will impose after considering Ruff's motion for departure.

The second conclusion the court can make is that Ruff's particular circumstances, which incorporate his personal history and background, physical condition and appearance, and sexuality, make him extraordinarily vulnerable to victimization in prison. The issue before the court is whether this vulnerability for victimization, or any of the other grounds asserted by Ruff, warrants a two-level downward departure. As more fully discussed below, the court concludes that it does to the extent of departure of one, but not two, levels.

## II.

■ The Sentencing Guidelines "did not eliminate all of the district court's discretion." *Koon v. United States*, 518 U.S. 81, 92, 116 S.Ct. 2035, 2044, 135 L.Ed.2d 392 (1996). Instead, "[a]cknowledging the wisdom, even the necessity, of sentencing procedures that take into account individual circumstances, ... Congress allows district courts to depart from the applicable Guideline range if 'the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.'" *Id.* (quoting 18 U.S.C.A. § 3553(b)) (citation omitted). In *Koon v. United States*, the Supreme Court adopted the First Circuit's approach for determining whether the Commission adequately considered a factor for departure. According to the *Koon* Court, the district court should make the following inquiries:

"(1) What features of this case, potentially, take it outside the guidelines' 'heartland' and make it a special, or unusual, case?

(2) Has the Commission forbidden departures based on those features?

(3) If not, has the Commission encouraged departure based on those features?

(4) If not, has the Commission discouraged departure based on those features?"

518 U.S. at 94, 116 S.Ct. at 2045 (quoting *United States v. Rivera*, 994 F.2d 942, 949 (1st Cir.1993)). Or, as the Eleventh Circuit has distilled the inquiry, the sentencing court must ask (1) what, if any, factor makes the case before it "atypical"; and (2) should that factor result in a different sentence. *United States v. Hoffer*, 129 F.3d 1196, 1200 (11th Cir.1997).

■ Whether departure based on the first question (what, if any, factor makes the case before it "atypical") is proper is a matter of trial court discretion. In *Koon*, the Supreme Court observed: "A district court's decision to depart from the Guidelines ... embodies the traditional exercise of discretion by a sentencing court.... Before a departure is permitted, certain aspects of the case must be found unusual enough for it to fall outside the heartland of cases in the Guideline. To resolve this question, the district court must make a refined assessment of the many facts bearing on the outcome, informed by its vantage point and day-to-day experience in criminal sentencing. Whether a given factor is present to a degree not adequately considered by the Commission, or whether a discouraged factor nonetheless justifies departure because it is present in some unusual or exceptional way, are matters determined in large part by comparison with the facts of other Guidelines cases. District courts have an institutional advantage ... in making these sorts of determinations...." 518 U.S. at 95–98, 116 S.Ct. at 2046–47. (citation omitted)

Thus, "[t]he relevant question ... is not ... 'whether a particular factor is within the "heartland"' as a general proposition." *Id.* at 98, 116 S.Ct. at 2047 (citation omitted). Rather, the "answer is apt to vary" depending on the circumstances of the case. *Id.* "These considerations are factual matters," *id.*, and thus the "determination" of the first question "is factual in nature." *Hoffer*, 129 F.3d at 1200.

The second question (should that factor result in a different sentence) "involves both legal and factual considerations." *Id.* "To determine whether a factor which takes a case outside the heartland should result in a different sentence, a district court must first decide whether the factor is forbidden, encouraged, discouraged, or unaddressed by the guidelines as a potential basis for departure.... If a factor is forbidden, .... a district court cannot use it to depart from the applicable guideline; to do so would be a *per se* abuse of discretion.... If a factor is encouraged, ... a court is authorized to depart from the applicable guideline if the guideline does not already take that factor into account.... If a factor is discouraged, ... or is an encouraged factor already taken into account by the applicable guideline, a district court may depart only if the factor is present to an exceptional degree or in some other way makes the case distinguishable from an ordinary case where the factor is present." *Id.* (citations omitted).

"Finally, a district court may depart on the basis of a factor not addressed by the Sentencing Commission if it finds, 'after considering the "structure and theory of both the relevant individual guidelines and the Guidelines taken as a whole," ' that the factor takes the case out of the applicable guideline's heartland. [*Koon,* 518, U.S.] at 94, 116 S.Ct. at 2045 (quoting *United States v. Rivera,* 994 F.2d 942, 949 (1st Cir.1993))." *Hoffer,* 129 F.3d at 1201. A district court departing on the basis of an unenumerated factor, however, "should bear in mind the Commission's expectation that such departures will be 'highly infrequent.' " *Id.* (quoting U.S.S.G. Ch. 1, Pt. A.).

Accordingly, the court will use this approach to examine each of Ruff's claims with respect to his motion for downward departure.

### A. Vulnerability to Victimization

■ The Supreme Court's second, third, and fourth questions, and the Eleventh Circuit's second question, have been answered, to some extent, by the Supreme Court in *Koon.* There, the Court expressly recognized that a sentencing court may consider "susceptibility to abuse" in prison as a factor for a downward departure in extraordinary or unusual circumstances. *Koon,* 518 U.S. at 111, 116 S.Ct. at 2053. Indeed, prior to *Koon,* many appellate courts recognized vulnerability to victimization as an appropriate ground for departure. *See United States v. Maddox,* 48 F.3d 791, 797–98 (4th Cir.1995); *United States v. Dykstra,* 19 F.3d 1437, 1994 WL 108868, at **1–2 (8th Cir.1994) (table) (court remanded for sentencing after examining defendant's particular circumstances, including "his slight build and youth in combination with his psychological illness and his rape by an older prisoner" and concluding that they were "sufficiently unusual to warrant a downward departure."); *United States v. Long,* 977 F.2d 1264, 1277 (8th Cir.1992); *United States v. Lara,* 905 F.2d 599, 605 (2d Cir.1990) (defendant's bisexuality and slight physical appearance made him more likely to be a victim of sexual abuse in prison, warranting the district court's downward departure).[16] The *Koon* Court also noted that even though some factors may be discouraged by the Sentencing Guidelines, a sentencing court is not prohibited from considering such factors. The example used by the Court in *Koon,* and applicable to the case at bar, is the Commission's amendment to the guidelines to discourage consideration of a defendant's "physical condition or appearance, including physique." U.S.S.G. § 5H1.4. The Supreme Court noted that the Commission "did not see fit, however, to prohibit consideration of physical appearance in all cases, nor did it address the broader categories of susceptibility to abuse in prison. By urging us to hold susceptibility to abuse in

---

**16.** The reason that vulnerability to victimization is an appropriate factor for downward departure was most succinctly stated in *United States v. Shasky:*

"Any person who is particularly susceptible to being abused in prison is as a matter of fact treated more harshly than otherwise similarly situated offenders if a court does not recognize that some people, for reasons entirely inconsistent with the Guidelines, are more likely to be abused in prison than other people. Such a sentencing scheme would neither be rational nor would such a scheme further the sentencing goal of imposing like punishment for like offenses."

939 F.Supp. 695, 701 (D.Neb.1996).

prison to be an impermissible factor in all cases, the Government would have us reject the Commission's considered judgment in favor of our own." *Koon,* 518 U.S. at 105–107, 116 S.Ct. at 2050–51.

■ Therefore, turning to the first question (which, as stated, is essentially fact-based and a matter of the discretion for the court), the court concludes that such extraordinary circumstances exist to justify a downward departure in Ruff's case. First, consistent with the holdings of *United States v. Lara,* 905 F.2d 599 (2d Cir.1990) (vulnerability to victimization found where defendant had youthful appearance, was bisexual, and had been threatened by other inmates to be forced into male prostitution) and another Second Circuit case considering vulnerability to victimization, *United States v. Gonzalez,* 945 F.2d 525, 526 (2d Cir.1991) (vulnerability to victimization found where defendant was of small build and had "a feminine cast to his face"), Ruff is of small build, of feminine appearance, identifies as a gay man, and has been sexually assaulted in prison in the past. Further, in cases in which departure is denied, courts have generally noted the absence of the very circumstances found in Ruff's situation. For example, in *United States v. Tucker,* 986 F.2d 278 (8th Cir.1993), the Eighth Circuit recognized that the potential for victimization could be a proper predicate for the district court's downward departure, but found that there was insufficient evidence to support the district court's conclusion that the defendant was particularly vulnerable to abuse. The court noted that it was possible that a defendant's personality configuration could render the defendant, a 67–year old woman, incapable of defending herself or resisting such abuse in the future, but that insufficient evidence of such vulnerability existed to support the district court's conclusion. *Id.* at 280. Specifically, the court noted the absence of a conclusive psychological evaluation, as well as contradictory testimony concerning the defendant's risk for abuse in prison. *Id.* Here, in contrast, Dr. Renfro's evaluation, which is consistent with the findings of the medical personnel at Jackson Hospital, provides an adequate basis to justify departure based on Ruff's vulnerability. *See also United States v. Kapitzke,* 130 F.3d 820 (8th Cir.1997) (no downward departure where defendant would be susceptible to abuse based on type of crime (child pornography), and physical appearance did not make him especially vulnerable to abuse); *United States v. Drew,* 131 F.3d 1269, 1270 (8th Cir.1997) (same, and also noted defendant's "average height and good health").

The court takes pains, however, to point out that it is not Ruff's status as a gay man, an effeminate man, or survivor of sexual abuse that warrants a departure. Were that the case, the number of defendants eligible for departure might well be unlimited. Rather, it is cumulative effect of these characteristics on his vulnerability to abuse that justifies departure. As the *Lara* court explained:

"The district court did not depart on account of defendant's homosexual orientation—which the government equates with a mental or emotional condition. Instead it considered [defendant's] sexual orientation, not as a separate characteristic meriting departure, but as it related to his vulnerability. That the district court did not base its sentence upon the defendant's bisexual orientation is of some significance because to have done so might have raised some serious constitutional concerns."

905 F.2d at 603 (citations omitted). Thus, it is the fact that the cumulative effect of Ruff's mental and physical characteristics will substantially increase his risk for sexual assault in prison—a penalty that not only violates the Sentencing Guideline's mandate for uniformity in sentencing, but, depending on the magnitude of indifference of prison officials to his risk for assault, could also violate the Eighth Amendment. "Prison conditions may be 'restrictive and even harsh,' ... but gratuitously allowing the beating or rape of one prisoner by another serves no 'legitimate penological objectiv[e],' ... any more than it squares with 'evolving standards of decency'.... Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Farmer v. Brennan,* 511 U.S. 825, 833–34, 114 S.Ct. 1970, 1977, 128 L.Ed.2d 811 (1994) (citations omitted) (constitutional claim stated where inmate shows he is incarcerated under conditions posing a substantial risk of

serious harm and the prison official has a deliberate indifference to the inmate's health or safety). The court therefore concludes that departure is appropriate on the basis of Ruff's extraordinary vulnerability to victimization in prison.

### B. Reduced Mental Capacity

■■■ The second basis for Ruff's motion for departure is that he had a "significantly reduced mental capacity" at the time that he committed the offense because he was suffering from major recurrent depression. The Sentencing Guidelines provide:

"If the defendant committed a non-violent offense while suffering from significantly reduced mental capacity not resulting from voluntary use of drugs or other intoxicants, a lower sentence may be warranted to reflect the extent to which reduced mental capacity contributed to the commission of the offense, provided that the defendant's criminal history does not indicate a need for incarceration to protect the public."

U.S.S.G. § 5K2.13. This court has previously held that in order to be eligible for the departure, a defendant must show (1) that the charged offense was non-violent, and (2) that the court is not precluded from departing pursuant to § 5K2.13 because the diminished capacity stemmed from drug addiction. *United States v. Hunter,* 980 F.Supp. 1439, 1450 (M.D.Ala.1997). U.S.S.G. § 4B1.2 defines the term "crime of violence," in relevant part, as "burglary of a dwelling, arson or extortion, involves use of explosives, or otherwise involves conduct that presents a serious risk of physical injury to another." Because the Post Office Ruff broke into cannot be considered a dwelling, Ruff has met the first half of the eligibility test.[17]

As for the second part of the eligibility test, there is evidence to suggest that Ruff was suffering from major recurrent depression at the time he broke into the Post Office.[18] However, there is also ample evidence to suggest that Ruff was abusing drugs at the time of the offense. Ruff's statement of responsibility indicates that he broke into the Post Office to get money because he had spent his paycheck on drugs, and that he proceeded to spend part of the money he received from the stolen money orders purchasing more drugs.[19] Dr. Renfro has also acknowledged Ruff's drug use in his report: "it would appear that at the time of the alleged offense, Greg Ruff was actively engaged in excessive use of crack cocaine."[20] In addition to § 5K2.13's limitation on departure for voluntary drug or alcohol use, U.S.S.G. § 5H1.4 states, "Drug or alcohol dependence or abuse is not a reason for imposing a sentence below the guidelines. Substance abuse is highly correlated to an increased propensity to commit crime." Some courts have permitted a downward departure where a defendant's drug addiction was the result of a pre-existing mental illness, or was not the sole cause of the defendant's impaired mental capacity. *See Hunter,* 980 F.Supp. at 1450 (citing *United States v. Cantu,* 12 F.3d 1506, 1514–15 (9th Cir. 1993); *United States v. McMurray,* 833 F.Supp. 1454, 1484 (D.Neb.1993), *aff'd,* 34 F.3d 1405 (8th Cir.1994), *cert. denied,* 513 U.S. 1179, 115 S.Ct. 1164, 130 L.Ed.2d 1119 (1995); *United States v. Speight,* 726 F.Supp. 861, 867–68 (D.D.C.1989)). It is arguable that because Ruff was, in the words of the examining psychologist, "self-medicating" his depression with cocaine, that his drug use was not the sole cause of his reduced mental capacity. Although somewhat tenuous, the court finds that Ruff has sufficiently shown that his alleged reduced mental capacity was not the sole result of his drug addiction. *See United States v. Brown,* No. 96 CR 451, 1997 WL 786643, at *4 (N.D.Ill.Dec.18, 1997) (defendant not disqualified from downward departure under § 5K2.13 where recurrent major depression was documented and where no evidence was presented regarding the defendant's actual drug use at the time of the offense).

■■■ The above analysis only results in a finding that Ruff is eligible to receive a departure under § 5K2.13, and not that a de-

---

17. "The word 'dwelling' in common parlance means a permanent residence." *Federal Hous. Admin. v. The Darlington, Inc.,* 358 U.S. 84, 88, 79 S.Ct. 141, 144, 3 L.Ed.2d 132 (1958).

18. Renfro report, at 6.

19. *See supra* note 2 and accompanying text.

20. Renfro report, at 6.

parture is warranted. Ruff must also show that his reduced mental capacity "contributed" to the commission of the crime. Departure under § 5K2.13 "requires a showing that the defendant's reduced mental capacity contributed to the commission of the offense; such a link cannot be assumed." *United States v. Frazier*, 979 F.2d 1227, 1230 (7th Cir.1992) (remanded where the district court made no finding that the defendant's "depressed mood" resulted in a significantly reduced mental capacity or contributed to the offense); *see also United States v. Patterson*, 15 F.3d 169, 171 (11th Cir.1994) (affirming trial court's decision denying motion for downward departure where court found that even if such a mental deficiency existed, it did not contribute to the commission of the crime); *United States v. Johnson*, 49 F.3d 766, 768 (D.C.Cir.1995) (requiring "direct connection" between offense and reduced mental capacity). The Third and Seventh Circuits have held that the term "mental capacity" in § 5K2.13 retains both a cognitive prong and a volitional prong. *United States v. McBroom*, 124 F.3d 533, 546 (3d Cir.1997); *United States v. Pullen*, 89 F.3d 368, 370–71 (7th Cir.1996), *cert. denied*, — U.S. —, 117 S.Ct. 706, 136 L.Ed.2d 627 (1997). That is, departure is warranted if the defendant's reduced mental capacity prevents the defendant from appreciating the wrongfulness of the offense, or if the defendant understands the wrongfulness of the act, but the reduced mental capacity renders the defendant unable to control the offensive conduct. *Id.* Ruff has failed to make either showing. First, in his testimony Dr. Renfro reiterated his finding that there was no indication to suggest that Ruff was "suffering from any condition that would have adversely affected his ability to perceive reality or to know right from wrong" when he committed the instant offense.[21] Second, Ruff has not presented any evidence to indicate his depression made him unable to control his behavior in terms of the commission of the crime. Downward departure is therefore denied on the basis of Ruff's reduced mental capacity.

## C. Efforts at Drug Rehabilitation

■ The next argument Ruff advances in support of his motion for a downward depar-

ture is that his efforts at drug rehabilitation entitle him to a downward departure. The Eleventh Circuit has held that a defendant's "truly extraordinary post-arrest, pre-sentence recovery" might warrant a downward departure. *United States v. Williams*, 948 F.2d 706, 710 (11th Cir.1991). In *Williams*, however, the Eleventh Circuit declined to find that circumstances existed to warrant a departure where the defendant had made recovery efforts for five months. *Id.* at 711. As the court noted, the defendant's " 'exceptional' progress toward partial recovery during five months in a court-ordered treatment program in which she earned a position of trust fails to take her case out of the heartland." *Id.* Although the court commends Ruff on his efforts in the 28–day program, the court does not find that his rehabilitation is extraordinary enough to warrant a downward departure.

## D. Childhood Abuse

■ Relying on precedent from the Ninth Circuit, Ruff argues that his history of childhood sexual abuse warrants a downward departure. Such a departure is discouraged under the Sentencing Guidelines: "mental and emotional conditions are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range [except as provided for in § 5K2]." U.S.S.G. § 5H1.3. In addition to discouraging departure on the basis of the defendant's mental and emotional conditions, the Sentencing Guidelines contain a policy statement that discourages a court's consideration of a defendant's childhood history: "Lack of guidance as a youth and similar circumstances indicating a disadvantaged upbringing are not relevant grounds for imposing a sentence outside the applicable guideline range." § 5H1.12 (policy statement).

■ However, courts have recognized that, notwithstanding the Sentencing Guidelines' discouragement of departure based on this factor, departure may be warranted if a defendant has suffered extraordinary abuse during childhood. *United States v. Pullen*, 89 F.3d 368, 371 (7th Cir.1996); *United States v. Brown*, 985 F.2d 478, 481 (9th Cir. 1993). As the Seventh Circuit explained,

---

**21.** *Id.* at 6, 7.

"section 5H1.3 has that weasel word 'ordinarily,' implying that in an extraordinary case a mental or emotional condition might warrant a lighter sentence even if did not fit the express exception in § 5K2.13. And the 'similar circumstances' to which section 5H1.12 refers might not be thought to encompass childhood sexual abuse by a parent ..." 89 F.3d at 371.[22]

Although it recognizes the authority to depart in this instance, the court declines to do so, finding that Ruff's history of childhood sexual abuse does not make his case an extraordinary one. *See Pullen,* 89 F.3d at 372 (defendant, whose father had raped and beaten him as a child, had not shown that "his particular history of abuse makes him an extraordinary robber exceptionally deserving of lenient treatment."). Accordingly, downward departure on the basis of Ruff's childhood abuse is denied.

### E. Current Treatment Plans

■ Ruff's final argument in support of his motion for downward departure is that a sentence of probation would be appropriate in order to enable him to continue his participation in drug rehabilitation programs. While the court may consider his current treatment plan in fashioning the appropriate sentence for Ruff under 18 U.S.C.A. § 3553(a)(2)(D), which requires the court to consider "the need for the sentence imposed ...' to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner," this consideration does not provide an independent or adequate basis for departure under the guidelines. Downward departure on the basis of Ruff's need to continue his enrollment in treatment programs is therefore denied.

### III.

■ Having determined that departure is appropriate on the basis of Ruff's vulnerability to victimization in prison, the court must now decide to what extent Ruff's sentence should depart from the Sentencing Guidelines. As with its decision to depart downward, the court's determination of the number of levels of departure is within its discretion. Although the Eleventh Circuit has in the past directed a district court to "justify the extent of the departure," *United States v. Onofre–Segarra,* 126 F.3d 1308, 1312 (11th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1110, 140 L.Ed.2d 163 (1998), the court has provided little guidance for determining the appropriate number of levels of departure; moreover, the court has rejected a "mechanical" analysis of vertical departures. *United States v. Taylor,* 88 F.3d 938, 948 (11th Cir.1996) (the sentencing court need not justify its decision to reject intervening levels in a vertical departure). Other circuits have required the sentencing court to "specifically articulate reasons for the degree of departure by us[ing] any 'reasonable methodology hitched to the Sentencing Guidelines to justify the reasonableness of the departure,' ... including using extrapolation from or analogy to the Guidelines." *United States v. Collins,* 122 F.3d 1297, 1309 (10th Cir.1997). However, some courts have abandoned this approach after the Supreme Court's holding in *Koon. See, e.g., United States v. Sablan,* 114 F.3d 913, 918–19 (9th Cir.1997) (en banc) (holding that prior circuit caselaw requiring district courts to gauge the extent of a departure by drawing analogies to the guidelines was overruled by *Koon*) *cert. denied,* —— U.S. ——, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998).

■ In any event, this court would be hard pressed to find a suitable analogy in the Sentencing Guidelines to the case at bar. Departing downward for vulnerability to victimization requires a somewhat different analytical framework than use of an analogy. In order to adjust Ruff's sentence to accommodate completely for his vulnerability, the court would need to remove the increased threat of sexual violence Ruff would face in prison.˙˙ This goal could be achieved by sentencing Ruff to a minimum sentence of imprisonment without departing downward, or by departing downward and imposing a sentence of probation with home confinement. That the court can accomplish the latter with only a one-level downward departure renders Ruff's case unique. In many cases, the sentencing court cannot completely re-

---

**22.** This reasoning is in accord with the Supreme Court's discussion of the discouraged factor of "physical condition or appearance, including physique," U.S.S.G. § 5H1.4, which is discussed *supra.*

move the threat of victimization in prison without a drastic departure from the guidelines. Despite this limitation, courts have upheld departures even when the departure only results in a reduction of a sentence of imprisonment, and not an alternative to incarceration. The Second Circuit explained the rationale underlying such a departure as follows:

"In our view, however, the fact that the Guidelines preclude what might be the most logical way to ensure [the defendant's] safety—i.e., a sentence of no jail time—does not mean that the court must then impose what is undoubtedly the most *il* logical of all results—placement in [prison] for the full 95 months. Rather, it seems to us that by choosing a shorter period of incarceration, and thereby diminishing the likelihood that [the defendant] would be assaulted, the court sensibly balanced [the defendant's] need for safety against the Government's interest in incarcerating wrongdoers."

*United States v. Gonzalez*, 945 F.2d 525, 527 (2d Cir.1991) (emphasis in original) (affirming district court's sentence of 33 months of imprisonment, about one-third of the minimum term prescribed by the guidelines); *cf. Koon*, 518 U.S. at 111, 116 S.Ct. at 2053 (approving sentencing court's departure for vulnerability to victimization despite imposition of sentence of imprisonment).

However, unlike the sentencing court in *Gonzalez*, this court has an alternative available that does not require a drastic departure from the Sentencing Guidelines and that will completely remove the threat of victimization.[23] Without this one-level departure, the minimum time of incarceration Ruff faces is four months.[24] Should the court deny Ruff's motion for a downward departure and stay within the applicable guidelines range, the court would sentence Ruff to the minimum of four months so as to mitigate any risk of his victimization in prison. However, the testimony of both the government's and Ruff's witnesses at the sentencing hearing reveals that a shorter sentence will not necessarily adequately address his drug addiction, as he is not likely to be placed in a treatment program within sufficient time for the program to be effective, or will not be placed in the program at all. The court also notes, that while the government has shown that its prison facilities are more than adequate to treat prisoners who are HIV-positive, because of his vulnerability to assault, Ruff will face an increased risk of infection of opportunistic diseases, which would be potentially fatal given his current physical condition. Moreover, neither the government nor probation has offered legitimate arguments as to the risk of harm Ruff might pose to the public to compel incarcerating him for a period of time.[25] Thus, the court concludes that

23. By departing downward one level, Ruff's sentencing range would be in Zone B of the sentencing table. U.S.S.G. Ch. 5, Pt. A (sentencing table). The sentencing options for Zone B are a sentence of imprisonment, a sentence of imprisonment with a term of supervised release with a condition that substitutes community confinement or home detention, provided at least one month is satisfied by imprisonment, or a sentence of probation that includes a condition or combination of conditions that substitute intermittent confinement, community confinement, or home detention. U.S.S.G. § 5C1.1(c). If the court determines that Ruff's motion for downward departure should be granted, Ruff would be eligible for probation under U.S.S.G. § 5B1.1 (authorization for probation).

24. With a sentencing range of 8–14 months in Zone C of the sentencing table, at least one-half of the minimum sentence must be satisfied by imprisonment. U.S.S.G. § 5C1.1(d)(2).

25. The government did make the following argument for Ruff's incarceration:

"If this counterphobia that we hear about leads [Ruff] to seek risks, to go out there and take chances with his sexual life and see if somehow he can master them ... how do we know [he] is not going to go out and infect someone and give them AIDS? ... if we take the chance of leaving him out, giving him a chance to get his act together, giving him a chance to let the [drug rehabilitation] program to run its course, someone might get AIDS because of that ... But for that reason alone, I would ask the Court to give him some sentence in jail."

The government's argument is not convincing. The government would have the court incarcerate Ruff purely on the basis of his vulnerability to sexual abuse, or more problematically, on the basis of his HIV-positive status. Not only is there absolutely no evidence in the record to suggest that Ruff engages in behavior harmful to others, but the government's argument privileges the health of would-be rapists in the free world over and above the health of would-be rapists in prison, and certainly privileges both groups over and above Ruff himself.

a one-level downward departure is appropriate.

The court makes this determination with some hesitation, noting that its analysis appears to place the cart before the horse. It would, no doubt, be more consistent with the Sentencing Guidelines' approach to determine first, that Ruff's vulnerability to victimization merits, say, a one-level departure, and then to sentence him accordingly within the proscriptions of the applicable sentencing range. However, the court has based its decision regarding the extent of the downward departure, in large part, with the goal of "provid[ing] the defendant with needed ... correctional treatment in the most effective manner," 18 U.S.C.A. § 3553(a)(2)(D), in mind. *See United States v. Shasky*, 939 F.Supp. 695, 700 (D.Neb.1996). One of the benefits of departing downward, besides removing Ruff's risk of being victimized in prison, is that the court will also be able to retain supervision over Ruff for a longer period of time. Without the departure, the court would be able to place Ruff on supervised release for a maximum of three years. § 5D1.2(a)(2). With the departure, the court will be able to sentence Ruff to period of probation of up to five years. § 5B1.2(a)(1).

It must also be noted that the one-level downward departure is fairly conservative compared with other cases dealing with inmate vulnerability to victimization. *See, e.g., Gonzalez*, 945 F.2d at 527 (affirming two-thirds reduction of sentence); *Lara*, 905 F.2d 599 (2d Cir.1990) (affirming five year reduction of sentence); *Shasky*, 939 F.Supp. 695 (D.Neb.1996) (departing four levels for vulnerability to victimization and rehabilitation efforts, thereby converting a sentencing range of 10–16 months with a mandatory 5–month incarceration to a sentence of 6–12 months with the possibility of probation). "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue. We do not understand it to have been the congressional purpose to withdraw all sentencing discretion from the United States District Judge." *Koon*, 518 U.S. at 111, 116 S.Ct. at 2053.

Considering the unique circumstances presented by the defendant Gregory Kirt Ruff and exercising its sentencing discretion, the court concludes that a one-level downward departure is appropriate.

Accordingly, it is ORDERED that the motion for downward departure filed by defendant Gregory Kirt Ruff on February 11, 1998, is granted to the extent of a one-level downward departure.