UNITED STATES of America

v.

Gerardo REYES–CAMPOS

No. CR.03–105–N.

United States District Court,
M.D. Alabama,
Northern Division.

Nov. 4, 2003.

Federal Defender, Jennifer Anne Hart, Federal Defender, Middle District of Alabama, Montgomery, AL, for Gerardo Reyes–Campos (1), defendant.

Kent B. Brunson, U.S. Attorney's Office, Montgomery, AL, for U.S. Attorneys.

### ORDER

MYRON H. THOMPSON, District Judge.

Defendant Gerardo Reyes–Campos, a Mexican citizen, has entered a guilty plea to one count of re-entering the United States after deportation subsequent to a felony conviction in violation of 8 U.S.C.A. § 1326. Reyes–Campos was before the court for sentencing on October 15, 2003, and he filed a motion for a two-level downward departure based on his cultural assimilation to the United States. Although the government agrees to Reyes–Campos's motion, the court is still compelled to determine whether there is a legal and factual basis for the motion. For the reasons discussed below, the court finds that the

facts and circumstances of Reyes–Campos's case support the motion and thus it is due to be granted.

## I. BACKGROUND

Reyes–Campos was born in Mexico in 1979 and came to the United States with his parents when he was nine. His parents came to this country looking for work; they are now permanent resident aliens who live in Lancaster, South Carolina, where Reyes–Campos's father works as a farmhand. Reyes–Campos has four siblings, ranging in age from four to 22, all of whom also currently live in South Carolina; his aunts and uncles also live in South Carolina. While in the United States, Reyes–Campos never took steps to be become a citizen or a lawful resident.

Reyes–Campos attended school in South Carolina from the fourth grade until he finished the eighth grade. After he left school, he went to work helping his father as a field hand. At the sentencing hearing, he testified that he lived in the United States continuously from the age of nine until the age of 19; however, the Presentence Investigation Report or PSR indicates that he was arrested in 1996 in Arizona at the age of 17 for falsely claiming United States citizenship and that he voluntarily returned to Mexico at that time.

At some point, Reyes–Campos traveled to Kentucky to work on a tobacco farm; there he lived with Oneida Aguire from approximately 1995 to 1999. Aguire became pregnant with Reyes–Campos's son sometime during his stay in Kentucky. In 1998, Reyes–Campos was convicted in federal court in Kentucky of conspiracy to posses counterfeit currency; he was sentenced to time served and supervised release; he was terminated from supervised release in 1999, but the Immigration and Nationalization Service did not deport him at that time. Reyes–Campos was subsequently deported in April 2002, after he was caught entering the country illegally in Arizona. While Reyes–Campos was incarcerated for the counterfeiting offense in 1999, Aguire left for Mexico with their child. Reyes–Campos has been to Mexico to visit his son, but he has never lived in Mexico with Aguire and their son.

Reyes–Campos met his current wife Jessica in Mexico about three years ago, and they were married in Mexico. Reyes–Campos and his wife have a daughter who was born in Mexico. The three of them lived in Mexico for short while and then came to the United States together. Reyes–Campos was most recently deported to Mexico on April 1, 2002, and he reentered the United States illegally sometime approximately six months after that to be reunited with his wife and daughter, who were living in South Carolina with his parents. Upon his illegal reentry, he traveled directly to South Carolina to find his wife. Reyes–Campos and his wife had moved to Alabama to live with his wife's parents at the time of Reyes–Campos's most recent arrest on April 6, 2003, in Clanton, Alabama for reckless driving. It was that arrest that led to the current charge of illegal reentry.

The PSR indicates that, in addition to his voluntary return to Mexico in July 1996 and his deportation in April 2002, Reyes–Campos has returned to Mexico on a number of other occasions. The United States Border Patrol has a record of encountering Reyes–Campos 14 times. According to the PSR, Reyes–Campos stated both that he and his family have periodically returned to Mexico to live for short periods of time and that he alternated living in Mexico with his current wife and their child and with his parents in South Carolina. Reyes–Campos also reported that he saw a psychologist in Mexico approximately four years ago for a six-month period. The PSR also indicates that Reyes–

Campos at one point owned a house in Mexico. Beyond working in Mexico for a few weeks two years ago, however, Reyes–Campos has not worked in Mexico.[1] Reyes–Campos speaks Spanish.

Reyes–Campos pled guilty to one count of violating 8 U.S.C.A. § 1326. Under U.S.S.G. § 2L1.2(a), a defendant convicted of violating § 1326, starts with a base-offense level of eight. Reyes–Campos's offense level was increased to 12 under U.S.S.G. § 2L1.2(b)(1)(D) because he was deported following a felony conviction. His offense level was decreased by two levels under U.S.S.G. § 3E1.1(a) for his acceptance of responsibility. Based on his past sentences, Reyes–Campos is in criminal-history category IV. For Reyes–Campos, because he has an offense level of ten and a criminal-history category of IV, the guidelines sentence is between 15 and 21 months.

## II. DISCUSSION

### A.

■ In the typical case, a sentencing court is to give a convicted defendant a sentence within the applicable range provided for in the United States Sentencing Guidelines. 18 U.S.C.A. § 3553(b); *Koon v. United States*, 518 U.S. 81, 85, 116 S.Ct. 2035, 2040, 135 L.Ed.2d 392 (1996). However, a sentencing court may depart from the applicable guideline range if "the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C.A. § 3553(b); U.S.S.G. § 5k2.0. To depart from the sentencing guidelines, the court must determine (1) what factor makes the case "atypical," and (2) whether the presence of that factor

should result in a different sentence. *United States v. Regueiro*, 240 F.3d 1321, 1324 (11th Cir.2001).

■ The sentencing guidelines and the case law distinguish among prohibited factors, discouraged factors, encouraged factors, and factors not considered by the Sentencing Commission. *Koon*, 518 U.S. at 95–96, 116 S.Ct. at 2045. Whether a factor is categorized as discouraged, encouraged, or "not considered" determines the standard that a defendant must meet before a sentencing court can rely on the factor to depart. The sentencing court may depart downward based on a discouraged factor "only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present." *Koon*, 518 U.S. at 96, 116 S.Ct. at 2045; *United States v. Hoffer*, 129 F.3d 1196, 1200 (11th Cir.1997). A sentencing court may depart based on a factor not considered by the Sentencing Commission if it finds that the factor removes the case from the heartland of the applicable guideline. *Koon*, 518 U.S. at 96, 116 S.Ct. at 2045; *Hoffer*, 129 F.3d at 1201. The standard for departing based on a factor not considered by the Sentencing Commission is more lenient than the standard for departing based on a discouraged factor, *United States v. Mejia*, 309 F.3d 67, 70 (1st Cir. 2002), but the Commission made clear that such departures are to be "highly infrequent." U.S.S.G. ch. 1, pt. A, intro. comment. 4(b).

In *United States v. Lipman*, 133 F.3d 726 (1998), the Ninth Circuit Court of Appeals was the first appellate court to consider a motion for downward departure in an illegal reentry case based on the defendant's alleged cultural assimilation. Defendant Michael Lipman lost his permanent-resident status and was deported in

---

**1.** Tr. of October 15, 2003, hearing, p. xx.

1994 following felony convictions for, among other crimes, possession of a weapon, attempted possession of marijuana, and sexual abuse. 133 F.3d at 728. Lipman reentered the United States illegally in August 1996, was arrested ten days after his entry, and subsequently pled guilty to one count of illegal reentry. *Id.* At his sentencing, Lipman moved for a downward departure on the basis of his cultural assimilation to the United States. *Id.* Lipman pointed out that, although he was a Jamaican citizen, he was brought to this country by his family at the age of 12; he lived in the United States legally for 23 uninterrupted years; he attend school in the United States; he married a United States citizen, with whom he raised five children, all United States citizens; he had two other American-born children; and, his mother, siblings, children, and wife all lived in the United States as American citizens. *Id.* at 729. Lipman argued that, because his illegal entry was motivated by his "cultural, emotional, and psychological ties" to the United States, his case was unlike the typical illegal reentry case. *Id.* The district court denied Lipman's motion, and Lipman appealed, arguing that the district court failed to recognize its authority to depart on the cultural-assimilation ground.

The Ninth Circuit held that a defendant's cultural assimilation into American society is a permissible grounds for departure. *Id.* at 731. In reaching its holding, the court discussed two ways in which a defendant's cultural assimilation to the United States could "speak to his offense and to his character." *Id.* The court wrote that "cultural assimilation may be relevant ... if a district court finds that a defendant's unusual cultural ties to the United States—rather than ordinary economic incentives—provided the motivation for the defendant's illegal reentry." *Id.* "Cultural assimilation may also be relevant to the character of a defendant ... insofar as his culpability might be lessened if his motives were familial or cultural rather than economic." *Id.*

The court offered two theories under which a motion for downward departure could be granted. First, the court held that because the Sentencing Commission never addressed or proscribed cultural assimilation, a downward departure could be appropriate under U.S.S.G. § 5K2.0, as a factor not considered by the Sentencing Commission, if the sentencing court decided the facts and circumstances of the case were sufficient to take it out of the relevant guideline's heartland. *Id.* at 730. Second, the court noted that cultural assimilation is similar to "family and community ties," a discouraged factor discussed in U.S.S.G. § 5H1.6. *Id.* The court went on to hold that "to the extent cultural assimilation denotes family and community ties, ... the district court has the authority to depart on this basis in extraordinary circumstances." *Id.*[2] Notwithstanding this

---

2. In *United States v. Mejia,* 309 F.3d 67, 70–71 (2002), the First Circuit Court of Appeals held that the argument for a downward departure in an illegal reentry case based on the defendant's cultural assimilation and motivation to be with family in the United States is the "semantic or practical equivalent" of the discouraged "family ties and responsibilities" factor in U.S.S.G. § 5H1.6, and that departure was thus appropriate only where the factor is present to an exceptional degree. The *Mejia* court wrote that while "[d]efendants usually invoke the 'family ties and re-

sponsibilities' extant at the time of sentencing in arguing for a downward departure ... there is nothing in the text of U.S.S.G. § 5H1.6 stipulating that 'family ties and responsibilities' is only a discouraged factor in assessing the consequences of a sentence and not in assessing the culpability for a crime." 309 F.3d at 71.

While the First Circuit's interpretation of the cultural-assimilation argument is not controlling, this court notes that the *Mejia* decision is also not compelling. The First Circuit wrote that the claim that a defendant should

holding, the court concluded that it lacked jurisdiction to review the district court's decision not to depart downward because the district court was aware of its authority to depart and exercised its discretion not to do so. *Id.* at 732.

■ Following *Lipman*, the Eleventh Circuit Court of Appeals acknowledged that district courts have the authority to depart downward in illegal-reentry cases based on the defendant's cultural assimilation, *United States v. Sanchez–Valencia*, 148 F.3d 1273, 1274 (11th Cir.1998) (affirming district court's denial of motion for downward departure), and the Fifth Circuit Court of Appeals followed suit. *United States v. Rodriguez–Montelongo*, 263 F.3d 429, 433 (5th Cir.2001) (remanding for district court to consider whether defendant's "circumstances [were] so atypical or extraordinary so as to warrant a downward departure on the basis of cultural assimilation.").[3] This court thus has no difficulty concluding that it has the authority to depart downward based on Reyes–Campos's cultural assimilation to the United States.

■ The court finds the best guidance on whether a downward departure is appropriate in *United States v. Martinez–Alvarez*, 256 F.Supp.2d 917 (E.D.Wis. 2003). Martinez–Alvarez pled guilty to il-

legally reentering the United States following deportation and moved for a downward departure at sentencing based on his cultural assimilation. 256 F.Supp.2d at 918. Like Lipman, Martinez–Alvarez argued that he was unlike the typical illegal immigrant because "he was motivated to re-enter because he has spent virtually all of his life in this country and most of his family live here." *Id.* The *Martinez–Alvarez* district court held that a number of objective factors should be used to evaluate the defendant's claim that his motivation in illegally entering the country was to be with his family: (1) "the length of time the defendant lived in the United States"; (2) "the defendant's level of familiarity with his country of origin"; (3) "the defendant's family ties"; and (4) "what the defendant did and where he went upon reentry." 256 F.Supp.2d at 920. The court also looked at the crime for which the defendant was arrested after reentering this country. *Id.* at 922.

■ This court finds these factors to be helpful and thus applies them to the present case, keeping in mind that "[w]hether a case is unusual enough to fall outside the heartland is determined in large part by comparison with other Guidelines cases." *United States v. Melvin*, 187 F.3d 1316,

---

receive a mitigated sentence because he was motivated by familial concerns is "not meaningfully distinguishable" from the claim that a defendant should receive a reduced sentence due to exceptional family ties and responsibilities. 309 F.3d at 71. However, 18 U.S.C.A. § 3553(a)(1) requires a sentencing court to consider "the nature and circumstances of the offense," a requirement that makes the defendant's motivation relevant to sentencing. There is no such statutory language that makes the collateral effects of incarceration on the defendant's family relevant. Further, courts have traditionally considered a defendant's motive to be important in making sentencing decisions. *See Wisconsin v. Mitchell*,

508 U.S. 476, 485, 113 S.Ct. 2194, 2199, 124 L.Ed.2d 436 (1993).

3. The Eighth Circuit reversed a district court's decision to grant a one-level downward based on cultural assimilation to a defendant convicted of drug possession and distribution. *United States v. Aguilar–Portillo*, 334 F.3d 744, 749–50 (8th Cir.2003). Noting that the rationale in *Lipman* was that cultural assimilation is relevant where the defendant's motivation is familial or cultural rather than economic, the court wrote that even if it "agreed with the principle established in *Lipman* ... [a] downward departure for 'cultural assimilation' could simply have no role in sentences for drug crimes."

1320 (11th Cir.1999) (citing *Koon*, 518 U.S. at 98, 116 S.Ct. at 2035).

### B.

█ The first factor cited in *Martinez–Alvarez* is the length of time the defendant has lived in the United States. 256 F.Supp.2d at 920. "Obviously a person who has lived here most of his life is more likely to have been assimilated (and thus motivated to re-enter) than one who has resided in this country for just a few months or years." *Id.* Neither the PSR nor the testimony during the sentencing hearing makes it entirely clear how much time Reyes–Campos has spent in the United States since he first came to this country when he was nine. It is clear, though, that Reyes–Campos has spent somewhere between ten and 14 years living in the United States, and that he has made at least several trips back to Mexico during that time. It is also clear that on at least two occasions—when Reyes–Campos and his wife lived together before coming to the United States and when he worked for a few weeks—Reyes-Campos stayed in Mexico for an extended period of time. By comparison, in *Martinez–Alvarez*, the district court granted a downward departure based on cultural assimilation to a defendant who had lived in the United States from the age of six months until the age of 26, 256 F.Supp.2d at 920, while in *Lipman*, the district court declined to grant a downward departure to an immigrant who lived in the United States for 23 consecutive years, 133 F.3d at 729. Thus, the amount of time that Reyes–Campos has spent in the United States is not strong objective evidence of his cultural assimilation.

Along with the length of time a defendant has been in the United States, the court should look at whether the defendant was brought to the United States as a child by his parents or came to this country on his own initiative as an adult; whether the defendant was educated in American schools; and whether, at the time of deportation, the defendant was a lawful permanent resident or had taken steps toward becoming a citizen. *Martinez–Alvarez*, 256 F.Supp.2d at 920. Like the defendants in *Lipman* and *Martinez–Alvarez*, Reyes–Campos was brought to the United States at a young age; he was nine when he came to this country with his parents. Reyes–Campos was also educated in the United States like the defendants in *Lipman* and *Martinez–Alvarez*, attending school in South Carolina from the fourth through the eighth grades. Unlike the defendants in *Lipman* and *Martinez–Alvarez*, however, Reyes–Campos made no effort to become a United States citizen or a legal resident alien. Both Lipman and Martinez–Alvarez were permanent resident aliens at the time of their sentencing. 256 F.Supp.2d at 920, 133 F.3d at 729.

The second factor is the defendant's level of familiarity with his country of origin. Reyes–Campos lived in Mexico until the age of nine; he speaks Spanish; he has returned to Mexico at least occasionally over the last several years; he worked for a short period of time there several years ago; and the PSR indicates that Reyes–Campos once owned a house in Mexico. Both Martinez–Alvarez and Lipman had substantially less familiarity with their countries of origin. Martinez–Alvarez lived in the United States from the time he was six months old until his deportation at age 26, and, after his deportation, he spent only one month in Mexico before returning to the United States. 256 F.Supp.2d at 921. Lipman—who was denied a downward departure—had lived in the United States for an uninterrupted period of 23 years starting at the age of 12 before he was deported to Jamaica. 133 F.3d at 729. Thus, the court does not find that Reyes–Campos is sufficiently unfamiliar with Mexico for this factor to provide much

objective support for his cultural-assimilation claim.

The third factor relied upon in *Martinez–Alvarez* is the defendant's family ties. "Do all or most of [the defendant's] family live in the United States? Does [the defendant] have a spouse or minor children here, and are those children United States citizens?" 256 F.Supp.2d at 920. In Reyes–Campos's case, almost all of his family lives here: his wife and their child, his parents, his siblings, and his aunts and uncles. Reyes–Campos's first wife and child, however, live in Mexico. *Lipman* and *Martinez–Alvarez* were very similar; in each case, almost all of the defendant's family lived in the United States. The court finds that—even though Reyes–Campos has family in Mexico—the presence in the United States of most of his family provides objective evidence that his motivation in coming to the United States illegally was "familial and cultural rather than economic." *Lipman*, 133 F.3d at 731.

The fourth factor is what the defendant did upon his illegal reentry. The key question is whether the defendant returned immediately to his family or took a detour "into other endeavors." 256 F.Supp.2d at 920. Reyes–Campos went straight to South Carolina to find his wife and child upon coming to the United States. From there, he and his wife headed to his wife's parents home in Clanton, Alabama where Reyes–Campos was going to work. In *Lipman*, the defendant claimed that his return to the United States from Jamaica was motivated by desire to visit his daughter in New York, but, after entering the United States in Miami, he traveled first to Los Angeles, where he was arrested for possession of 39 pounds of marijuana. 133 F.3d at 729. In this case, Reyes–Campos's direct route to his family provides objective evidence that his motivation for re-entering the United States was to be reunited with his family.

The crime for which a defendant was arrested is also relevant to determining the defendant's motivation in returning to the United States. The court in *Martinez–Alvarez* observed that many illegal-reentry defendants are arrested for committing other crimes but that the defendant in that case was charged with illegal reentry after being stopped for only a traffic violation. 256 F.Supp.2d at 922. There was no evidence, the court stated, that Martinez–Alvarez returned to the United States to continue a life of crime. *Id.* The same can be said of Reyes–Campos, who was charged with illegal reentry after being stopped for reckless driving. There is no evidence that Reyes–Campos came to the United States to commit crimes, and this is further evidence in support of his claim that he was motivated by his family connections in this country.

In conclusion, the court finds that the facts and circumstances of Reyes–Campos's offense support taking it outside of the heartland of illegal-reentry cases covered by U.S.S.G. § 2L1.2. The court finds it particularly supportive that Reyes–Campos was originally brought to the United States by his parents; that almost all of Reyes–Campos's family is in the United States; that Reyes–Campos went straight to his family in South Carolina upon his entry in the United States; and that there is no evidence that he is here to do anything but to be with his family and support them. The court recognizes that, unlike in *Lipman* and *Martinez–Alvarez*, Reyes–Campos has spent some time in Mexico and that Reyes–Campos has an ex-wife and child in Mexico; however, the objective factors discussed above support the conclusion that Reyes–Campos's unusual cultural and familial ties to the United States motivated his illegal entry and distinguish his case from the heartland of illegal reentry cases covered by U.S.S.G. § 2L1.2.

A sentencing court's determination of the number of levels of departure is within its discretion. *United States v. Ruff,* 998 F.Supp. 1351, 1362 (M.D.Ala. 1998) (Thompson, J.). In *Martinez–Alvarez,* the court analogized the downward departure based on cultural assimilation to the three-level reduction in U.S.S.G. § 2L1.1(b)(1) for certain immigration crimes if the offense involved the "smuggling, transporting, or harboring only of the defendant's spouse or child." 256 F.Supp.2d at 922. The court reasoned that the guidelines valued a defendant's motive to be with his family at three-offense levels. *Id.* The court notes that U.S.S.G. § 2H3.1(b)(1), the guideline applicable for offenses involving eavesdropping and interception of communications, includes a three-level increase where the "purpose of the offense was to obtain ... commercial advantage or economic gain." While this guideline is not directly analogous, it reflects that the Sentencing Commission values a defendant's non-pecuniary motive for committing an offense at three offense levels. Here, the facts and circumstances of Reyes–Campos's offense that take it out of the heartland of illegal reentry cases indicate Reyes–Campos's non-pecuniary, familial motivation in committing his offense. The court thus concludes that it would be within its discretion to depart up to three levels. At the urging of Reyes–Campos and the government, Reyes–Campos's motion for a two-level downward departure will be granted.

For the above reasons, it ORDERED that the motion for downward departure based on cultural assimilation, filed by defendant Gerardo Reyes–Campos on October 10, 2003 (doc. no. 26), is granted.