**UNITED STATES of America,**
**Plaintiff,**

v.

**Ruben MARTINEZ–ALVAREZ,**
**Defendant.**

**No. 02–CR–223.**

United States District Court,
E.D. Wisconsin.

April 14, 2003.

Carol Kraft, Milwaukee, WI, for Plaintiff.

Brian Mullins, Madison, WI, for Defendant.

### DECISION AND ORDER

ADELMAN, District Judge.

Defendant Ruben Martinez–Alvarez was charged with unlawful re-entry into the United States following deportation. He pled guilty to the charge, and a pre-sentence report (PSR) was prepared in anticipation of sentencing. Defendant's offense level was determined to be 21 and his

criminal history category IV, producing an imprisonment range of 57–71 months.

There are no objections to the guideline determinations in the PSR, but defendant moves for a downward departure pursuant to U.S.S.G. § 5K2.0 because his "cultural assimilation" to the United States decreased his culpability for unlawfully re-entering. In this decision I consider the motion.

## I.

The court may "depart from the applicable Guideline range if 'the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.'" *Koon v. United States*, 518 U.S. 81, 92, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996) (quoting 18 U.S.C. § 3553(b)). The Commission has provided guidance in making departure decisions by listing certain factors that are "forbidden" bases for departure, "encouraged" bases for departure, and "discouraged" bases for departure. *Id.* at 93–95, 116 S.Ct. 2035

The Supreme Court has thus adopted the following test for determining whether to depart. First, what factors of the case make it special or unusual? Second, has the Commission forbidden departures based on those factors? If not, has the Commission encouraged departures based on those factors? If not, has the Commission discouraged departures based on those factors? *Id.* at 95, 116 S.Ct. 2035. If the special factor is a forbidden factor, the sentencing court cannot use it as a basis for departure. If the special factor is an encouraged factor, the court is authorized to depart if the applicable Guideline does not already take it into account. If the special factor is a discouraged factor, or an encouraged factor already taken into account by the applicable Guideline, the court should depart only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present. If a factor is unmentioned in the Guidelines, the court must, after considering the structure and theory of both relevant individual guidelines and the Guidelines taken as a whole, decide whether it is sufficient to take the case out of the Guideline's heartland.

*Id.* at 95–96, 116 S.Ct. 2035 (citations and internal quote marks omitted).

## II.

### A.

The special factor that potentially takes this case out of the heartland is defendant's "cultural assimilation" to the United States. Defendant contends that he is not the typical unlawful re-entry defendant, who returns to the United States for purely economic reasons, or, worse yet, to commit further crimes. Rather, he indicates that he was motivated to re-enter because he has spent virtually all of his life in this country and most of his family live here. Therefore, he contends, he is less culpable than the usual re-entry offender. The courts have generally found that cultural assimilation can be a viable basis on which to grant a downward departure. *E.g., United States v. Rodriguez–Montelongo,* 263 F.3d 429 (5th Cir.2001); *United States v. Sanchez–Valencia,* 148 F.3d 1273 (11th Cir.1998); *United States v. Lipman,* 133 F.3d 726 (9th Cir.1998).[1]

---

1. The Seventh Circuit discussed cultural assimilation in *United States v. Bautista,* 258 F.3d 602, 607 n. 2 (7th Cir.2001), but did not express an opinion on its appropriateness as a basis for departure.

It is important to first distinguish this basis for departure from two related bases—family and community ties, and deportable alien status. The courts have found that a defendant's unusual family circumstances can form the basis for a departure. *E.g., United States v. Canoy,* 38 F.3d 893 (7th Cir.1994); *United States v. Norton,* 218 F.Supp.2d 1014 (E.D.Wis. 2002); *see also* U.S.S.G. § 5H1.6. In those cases, courts typically depart in order to mitigate the collateral effects of the sentence on the defendant's family. The departure is not granted because defendants who have families are less culpable than those who do not; rather, the court reduces the sentence so that the defendant can maintain his or her vital role within the family.

Courts have also held that a downward departure may be granted based on the defendant's status as a deportable alien. *E.g., United States v. Farouil,* 124 F.3d 838 (7th Cir.1997).[2] Departures may be granted on this basis if the defendant can show that his conditions of confinement will be substantially more onerous because of his deportable status, or if he can show that his individual circumstances make deportation extraordinarily harsh for him, as, for example, where he will be sent to a country he does not know and/or will be separated from his family and friends. *United States v. Ferreria,* 239 F.Supp.2d 849, 853 (E.D.Wis.2002). Again, this type of departure, under either theory, does not reflect a determination that a defendant faced with deportation following his sentence is somehow less blameworthy than a citizen; rather, the court acts to ameliorate some of the harshness peculiar to the defendant's status as an alien, harshness a citizen will not face.

Departures based on cultural assimilation are unlike either of these. Although the defendant will be a "deportable alien," and the factual predicate for his claim will likely include references to his family ties, this ground for departure is directly tied to the defendant's culpability for the offense of conviction. This is so because the defendant worthy of such a departure will have been motivated to re-enter because he wishes to be with his family in the United States and has otherwise been "assimilated" into this country. As the Ninth Circuit stated in *Lipman:*

> [C]ultural assimilation is distinguishable from the threat of future deportation because a defendant's cultural assimilation may speak to his offense and to his character. Recognizing cultural assimilation as a factor that may justify departure therefore would not result in the arbitrary dividing line between all aliens and all citizens that we [have] rejected .... For example, cultural assimilation may be relevant to sentencing under U.S.S.G. § 2L1.2 if a district court finds that a defendant's unusual cultural ties to the United States—rather than ordinary economic incentives—provided the motivation for the defendant's illegal reentry or continued presence in the United States. Cultural assimilation may also be relevant to the character of a defendant sentenced under U.S.S.G. § 2L1.2 insofar as his culpability might be lessened if his motives were familial or cultural rather than economic. Thus, unlike the general threat of deportation, cultural assimilation is a fact-specific

---

**2.** It is important to note that deportable alien status is *not* a basis for departure when, as here, the defendant is charged with unlawful re-entry following deportation because the guideline already takes this factor into account. *United States v. Gonzalez–Portillo,* 121 F.3d 1122, 1125 (7th Cir.1997). Nevertheless, departures based on cultural assimilation are appropriate in these cases. *Lipman,* 133 F.3d at 730–31.

ground for departure that may speak to an individual defendant's offense, his conduct and his character, and not just to possible future events unrelated to the defendant's individual circumstances. 133 F.3d at 731.

### B.

Because cultural assimilation is a factor unmentioned in the guidelines, a defendant seeking a departure on this basis must show that his motivation in re-entering the United States takes his case out of the heartland of typical re-entry cases. Of course, the court need not accept the defendant's bald claim that he broke the law because he wanted to be with his family in the United States. Rather, the court should look to certain, more objective factors.

First, the court should consider the length of time the defendant lived in the United States. Obviously, a person who has lived here most of his life is more likely to have been assimilated (and thus motivated to re-enter) than one who has resided in this country for just a few months or years. Similarly, the court can consider whether the defendant was educated in American schools, which would advance his assimilation. The court can also consider the defendant's residency status at the time of deportation. Was he a lawful permanent resident? Had he taken steps toward becoming a citizen? Also relevant are the circumstances of the defendant's initial entry into the United States. Was he brought here as a child by his parents, or did he enter on his own initiative as an adult? These considerations bear on the degree of assimilation.

Second, the court should analyze the defendant's level of familiarity with his country of origin. Has he lived there for any appreciable period of time, particularly as an adult? Does he speak the language? Has he ever worked there? A defendant deported to a country his does not know will have a greater motivation to leave than one deported to a more familiar environment.

Third, the court should consider the defendant's family ties. Do all or most of his family live in the United States? Does he have a spouse or minor children here, and are those children United States citizens? The desire to be with one's children can be a strong motivation to re-enter unlawfully.

Finally, the court should analyze what the defendant did and where he went upon re-entry. Did he immediately return to his family, or did he take a detour into other endeavors? In *Lipman*, for example, the defendant claimed that he re-entered to be with his daughter in New York, yet was arrested for possession with intent to distribute marijuana in Los Angeles. *Id.* at 728–29.

By analyzing all of these factors, the court can determine the degree of the defendant's assimilation and the sincerity of his professed motivation in re-entering the country unlawfully. With these factors in mind I turn to the present case.

### III.

### A.

Defendant was born in Mexico in 1977 and came to the United States with his mother at the age of six months. Defendant's father remains in Mexico, but the two have had no contact since defendant was six years old. Defendant grew up in Chicago and attended the Chicago public schools. He was granted temporary resident status in 1984 and permanent resident status on March 30, 1990.

Defendant's mother still lives in Chicago. Defendant has four siblings, three of whom reside in Chicago or Milwaukee. The fourth is in the United States Navy stationed in Japan. Defendant is also the

father of a five year old girl, who lives with her mother in Burbank, IL. Defendant reports that he last had contact with his daughter last summer, and that her mother has cut off contact between them and is engaged to marry another man.

The legal circumstances that bring us to this point are as follows: On December 11, 1997, defendant was convicted of possession of a controlled substance and arson in Illinois, and on April 2, 1998, he was ordered deported. He was paroled from prison on August 14, 2001, and deported to Mexico from Laredo, Texas on August 29, 2001.

Defendant indicates that he stayed in Mexico for less than one month before returning unlawfully to the United States. Upon re-entry, he returned to Chicago and stayed there for five or six months before coming to Milwaukee in early 2002. He lived with his sister in Milwaukee off and on, but mostly stayed with friends. He reports that he obtained work with a construction company in Milwaukee. Defendant's sister indicates that defendant returned to the United States because his family is here and he has a daughter to support. His brother similarly states that defendant re-entered to be a father to his child.

Defendant was arrested for a traffic violation by the Milwaukee police on October 7, 2002, and it was determined that he was here illegally. The instant charge followed.

### B.

I will review defendant's case in light of the four factors identified above.

The first factor weighs in favor of departure. Defendant has lived in this country virtually his entire life. He came here at the age of six months with his mother, and, save for the one month immediately following his deportation, has not lived in Mexico. He attended the public schools of Chicago and had been granted the status of lawful permanent resident. Essentially, he has lived his life as an American.

The second factor, related to the first, also favors departure. Defendant has no experience living in Mexico.

The third factor, again, favors departure. All of defendant's family save his father live in the United States. And defendant has had no contact with his father in many years.

The fourth consideration also supports departure. Upon re-entry, defendant returned to the Chicago-area, where his mother and daughter reside. He attempted to become a positive factor in his daughter's life, providing two to three hundred dollars per month to the child's mother and maintaining contact with the child. He provided financial support despite the fact that no court order required him to do so. However, the child's mother soon became involved with another man, who apparently became jealous of defendant, causing the child's mother to cut off contact. As a result, defendant indicates that he has not seen his child since last summer. It seems reasonable to assume that defendant's immigration status precluded any legal effort to assert a relationship with his child. Defendant then moved to Milwaukee and at times lived with his sister, although he stayed mostly with friends.

 Taking all of these factors into account, I find that this case is sufficiently unusual to merit a small departure. Most unlawful re-entry defendants I have seen lack defendant's ties to this country; as a practical matter, defendant was raised and lived as an American his entire life. Had his mother entered this country just six months earlier, defendant would be a citizen by virtue of birth in the United States. Upon deportation, defendant will be sent to a country he does not know.

Moreover, many re-entry defendants arrive in my court after being arrested for committing other crimes. Defendant was charged with unlawful re-entry after being stopped for a traffic violation. There is no evidence that he returned to the United States to continue a life of crime. Rather, he returned to the area of the country where his family lived, obtained work, and tried to be a father to his child.

The government opposes departure, arguing that defendant failed to assimilate in a socially responsible way. It notes that defendant dropped out of the Chicago public schools, and that his youth was marked by gang affiliation, multiple arrests, drug abuse, and time in foster care and group homes. These factors perhaps bear upon defendant's character, but they are not directly relevant to the issue before me—defendant's motivation to re-enter. There is no evidence that defendant re-entered the country to resume his gang association or otherwise engage in socially destructive behavior.

The government also notes that upon re-entry defendant has had limited contact with his child, and that he stayed with his sister only sporadically upon coming to Milwaukee. As noted, defendant did make an effort to be father to his child. To the extent that these are relevant concerns, I believe that they bear more on the appropriate degree of departure rather than on the decision whether to depart. In sum, this case is sufficiently removed from the heartland of re-entry cases to support a small departure.

■ Once a court decides to depart the extent of the departure is a matter within the court's discretion and will be upheld so long as it is reasonable. *United States v. Cruz–Guevara*, 209 F.3d 644, 647 (7th Cir.2000); *see also* 18 U.S.C. § 3742(f). There are no "hard and fast rules" governing the extent of a departure, *Cruz–Guevara*, 209 F.3d at 648; rather,

the "law merely requires that district judges link the degree of departure to the structure of the Guidelines and justify the extent of the departure taken." *United States v. Scott*, 145 F.3d 878, 886 (7th Cir.1998). The Seventh Circuit has approved a method that involves calculating the defendant's sentence by analogy to existing guideline provisions. *Cruz–Guevara*, 209 F.3d at 648.

In determining the extent of departure under these circumstances, the closest analogy to an existing guideline is to U.S.S.G. § 2L2.1(b)(1), which provides for a three level reduction in certain immigration offenses if the crime "involved the smuggling, transporting, or harboring only of the defendant's spouse or child." This suggests that the Commission has determined that a defendant's violation of immigration laws with the motive of being with his family is worth a three level reduction.

■ In this case, however, three levels would be too great a departure. Defendant does not have a spouse living in the United States, and he did not live with his child upon re-entry. Further, I believe that defendant's prior criminal record, which included arson and drug offenses, and his admitted membership in a street gang would make a departure of that extent inappropriate. Therefore, I will depart by one level. Such a departure places defendant in an imprisonment range of 51–63 months. This is adequate to provide just punishment, deter others from similar conduct, and protect the public.

I sentence defendant to 51 months in prison. Other conditions of the sentence appear in the judgment.

## IV.

**THEREFORE, IT IS ORDERED** that defendant's motion for a downward depar-

ture pursuant to U.S.S.G. § 5K2.0 is **GRANTED**.