**UNITED STATES of America, Plaintiff–Appellant,**

v.

**Ernesto RIVAS–GONZALEZ, Defendant–Appellee.**

**No. 03–30167.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 3, 2003.

Filed April 22, 2004.

William Mercer (argued), United States Attorney, Billings, MT, for the plaintiff-appellant.

Melissa Harrison (argued), Assistant Federal Defender, Missoula, MT, for the defendant-appellee.

David Avery, Research Attorney, Federal Defenders of Montana, Missoula, MT, for the defendant-appellee.

Before: KLEINFELD, GOULD, and TALLMAN, Circuit Judges.

GOULD, Circuit Judge:

The United States appeals a decision of the district court to depart downward by eight levels in sentencing an alien who was charged with illegal reentry after having been previously removed. We have jurisdiction under 18 U.S.C. § 1291 and we reverse.

## I

Ernesto Rivas–Gonzalez ("Rivas") is a forty-five year old Mexican national who first entered the United States illegally in 1979 at age twenty-one. On January 8, 1993, almost fifteen years after his first illegal entry, he was sentenced in state court in Yakima, Washington, to a prison term of one year and one day on a drug-related violation. He served the sentence and was thereafter deported to Mexico on July 24, 1993.

Rivas has admitted that soon after he was deported to Mexico in 1993, he reentered the United States illegally without inspection and began living again in Yakima, Washington. There, he met an American citizen named Terry Rivas, whom he married on February 12, 1995. Rivas and his wife later had two American-born daughters.

The government learned of Rivas's illegal status from an anonymous source. Rivas was taken into custody on September 12, 2002. He was charged with reentering the United States without inspection after

having been previously deported in violation of 8 U.S.C. § 1326(a). On December 11, 2002, Rivas pleaded guilty. The Presentence Investigation Report ("PSR"), to which neither party objected, computed Rivas's total offense level at seventeen. His criminal history category was II because of his prior arrest and term of imprisonment. Rivas's resulting guideline sentencing range was 27–33 months. The probation officer in the PSR said that he was unaware of information that would indicate that a departure was warranted in Rivas's case.

Rivas filed a Sentencing Memorandum requesting a five-level downward departure (from seventeen to twelve), which would reduce the sentence range from 27–33 months to 12–18 months. Rivas asked for a 12–month sentence, arguing that his cultural assimilation into United States society and his family ties in this country justified a shorter sentence.

Over the government's expressed objections, the district court granted Rivas's request. Although the district court did not explicitly differentiate between cultural assimilation and family ties when it articulated its reasons for departing, the district court explained why, in its view, the case stood "out-side the heartland" of cases governed by the Sentencing Guidelines. *Koon v. United States*, 518 U.S. 81, 109, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996). The district court said that Rivas's case was "the most extraordinary of any of these illegal alien cases that I have seen in seven years on the bench." Among other things, the court recognized that numerous letters submitted at sentencing on behalf of Rivas's family and members of the Butte, Montana community, attested to Rivas's positive integration into the community and commended his character;[1] that

---

1. To illustrate, the letters described Rivas as "a hard working upstanding citizen," "a good

Rivas was employed in construction, as opposed to agriculture, and had received accolades for his job performance; that Rivas was married and in a stable relationship; that Rivas expressed an exceptional degree of love and care for his children; that he speaks English, the predominant language used in his family's home; that Rivas's four siblings legally resided in the United States; and that Rivas had not "simply popped across the border," but rather, he had been living in the United States for some time before being deported. The district court also noted that after Rivas's wife Terry became permanently disabled in 1997, Rivas had served as the family's sole provider, and that only after Rivas's arrest was the family forced to resort to public assistance.

At Rivas's sentencing, moved by the cumulative grounds for leniency in this case, the district court added, "it seems to me that this is the kind of person that we want to have living in this country. He's a good citizen. Even though he isn't a citizen, he contributes far more to the community. And his connections with that and his cultural assimilation into the community is far greater than many of the people who live here simply by birth."

Thus motivated, the district court departed by eight levels (from seventeen to nine), which even exceeded by three levels the degree of departure that Rivas had requested. The district court sentenced Rivas to six months in prison and two years of supervised release. Rivas served his sentence and was remanded to the custody of the U.S. Immigration and Naturalization Service, whereupon he was deported to Mexico. Rivas's daughters continue to live with their mother Terry in the United States. On legal grounds, the government challenges the district court's decision to depart and the extent of the contested departure.

## II

### A

■ This case is not moot despite that Rivas has been deported. Were Rivas to reenter the United States, he would be required to comply with the conditions of his yet unserved two-year term of supervised release. That the likelihood of Rivas's reentry into the United States is speculative is of no moment. *United States v. Valdez–Gonzalez,* 957 F.2d 643, 647 (9th Cir.1992) (noting that the Supreme Court has allowed speculative contingencies to prevent mootness, and holding that "[b]ecause ... the government could seek the extradition of [defendants] or because [defendants] could face further proceedings in this case upon reentering the country, the appeal is not moot.") (citing *United States v. Villamonte–Marquez,* 462 U.S. 579, 581, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983)), *abrogated on other grounds as noted by United States v. Webster,* 996 F.2d 209, 211 (9th Cir.1993).

### B

■ The district court sentenced Rivas before Congress passed the Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today Act of 2003 ("PROTECT Act"), Pub.L. No. 108–21, 117 Stat. 650. The PROTECT Act alters our standard of review from abuse of discretion to de novo in cases where the district court departed from the otherwise applicable Guidelines range. In *United States v. Phillips,* 356 F.3d 1086, 1098–1099 (9th

man who would go out of his way to help someone in need," "a responsible father, husband, and provider for his family," "a de-

pendable employee ... [who] works well with others," and "very devoted to his wife and children."

Cir.2004), we held that "the PROTECT Act's new standard of review applies to cases pending on appeal at the time of its enactment." *See also United States v. Daychild*, 357 F.3d 1082, 1106 (9th Cir. 2004). Following *Phillips*, we apply the standard of review required by the PROTECT Act under 18 U.S.C. § 3742(e), and we review de novo the district court's decision to depart downward in fashioning Rivas's sentence.

### C

■ The government contends that the district court erred when it departed downward on the basis of cultural assimilation. The district court relied on our precedent in *United States v. Lipman*, 133 F.3d 726 (9th Cir.1998), in which we held, without any prior federal authority, that a sentencing court has the authority under U.S.S.G. § 5K2.0 to consider evidence of cultural assimilation.[2] We explained in *Lipman*:

> cultural assimilation may be relevant to sentencing under U.S.S.G. § 2L1.2 [governing unlawful reentry] if a district court finds that a defendant's unusual cultural ties to the United States—rather than ordinary economic incentives— provided the motivation for the defendant's illegal reentry or continued presence in the United States. Cultural assimilation may also be relevant to the character of a defendant sentenced under U.S.S.G. § 2L1.2 insofar as his cul-

pability might be lessened if his motives were familial or cultural rather than economic.

133 F.3d at 731. We also declared that "to the extent that cultural assimilation denotes family and community ties, we hold that the district court has the authority to depart on this basis in extraordinary circumstances." *Id.* at 730.

No published opinion from our circuit has discussed in further detail the scope or character of the cultural assimilation departure ground set forth in *Lipman*. However, courts in other jurisdictions have cited *Lipman* for the proposition that a sentencing court may take into account a defendant's degree of cultural assimilation when it considers whether to depart downward. *See, e.g., United States v. Rodriguez–Montelongo*, 263 F.3d 429, 432 (5th Cir.2001) (holding that cultural assimilation is a permitted ground for departure); *United States v. Sanchez–Valencia*, 148 F.3d 1273 (11th Cir.1998) (holding that sentencing judge was aware of his authority to depart in light of *Lipman*); *United States v. Reyes–Campos*, 293 F.Supp.2d 1252, 1257 (M.D.Ala.2003) ("This court ... has no difficulty concluding that it has the authority to depart downward based on ... cultural assimilation to the United States."); *United States v. Martinez–Alvarez*, 256 F.Supp.2d 917, 920 (E.D.Wis.2003) (laying out four-factor test for determining cultural assimilation).[3]

---

**2.** 18 U.S.C. § 3553(b) is the implementing statute of U.S.S.G. § 5K2.0. The statute states that a departure is appropriate where "there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." The defendant bears the burden of proving by a preponderance of the evidence that the circumstances of his or her case warrant a downward departure. *United*

*States v. Anders*, 956 F.2d 907, 911 (9th Cir. 1992).

**3.** The Eighth Circuit in *United States v. Aguilar–Portillo*, 334 F.3d 744, 749 (8th Cir.2003), raised cultural assimilation as a possible ground for departure, but stopped short of recognizing it as a proper ground, holding, "[e]ven if we agreed with the principle established in *Lipman*, we think that a departure was not appropriate here."

In *Lipman,* we addressed whether the district court was aware of its discretion to depart based on cultural assimilation grounds. We decided that while the district court properly considered cultural assimilation as a permissible ground for departure, we lacked jurisdiction to review and second-guess the district court's discretionary decision not to grant a downward departure. Thus in *Lipman,* though relief was not given on this ground, we established cultural assimilation as a permissible ground for departure. *Lipman* illuminates the basis for this theory of departure, which was judge-made, not designated by the legislature.

Lipman, a Jamaican citizen, had been brought to the United States by his family at age twelve; he lived here legally for twenty-three uninterrupted years; he attended public schools in the United States through high school; he married a United States citizen; he fathered seven American-born children; and his entire family, including his mother, siblings, children, and wife, all lived in the United States as American citizens. *Lipman,* 133 F.3d at 729. Regrettably, however, Lipman was not satisfied with the opportunity for a better life here without crime, and instead, went astray and was convicted of several felonies. These prompted his deportation. After being deported, Lipman returned illegally without permission of the Attorney General. After being charged and convicted, he argued at sentencing that his cultural assimilation mitigated his culpability for the crime of illegal reentry, because he had been motivated to reenter by "cultural, emotional, and psychological ties" to the United States. *Id.* Lipman also argued that deporting him would cause him greater hardship than it would cause most illegal reentry defendants because the United States was effectively his homeland. *Id.* Nonetheless, the district court in *Lipman* declined to depart, and one reason given

was that Lipman was not credible because he claimed to have returned to visit his disabled daughter in New York who had been sexually assaulted, but after his illegal reentry he had traveled to Los Angeles instead. On these facts, we held in *Lipman* that cultural assimilation was a permissible ground for departure, but that in Lipman's case we would not review the district court's discretionary decision not to depart.

 Under *Lipman,* cultural assimilation remains a proper basis for granting a downward departure in 8 U.S.C. § 1326 cases for persons brought to the United States as children, who had adapted to American culture in a strong way and who, after deportation, returned to the United States for cultural rather than economic reasons. The district court here incorrectly expanded *Lipman* 's reach to an inapposite set of facts that go beyond *Lipman* 's proper scope and rationale. Rivas first came to the United States as a twenty-one year-old adult, so Rivas, unlike Lipman, *has* known another home outside of the United States. According to the PSR, Rivas speaks only some English and still has command of his native Spanish, with skills in reading, writing, and speaking that language. Before being deported the first time, Rivas had lived most of his life in Mexico. When he reentered the United States illegally for the second time, Rivas had not yet met his American wife, nor had he fathered his two American children. *Cf. United States v. Martinez–Alvarez,* 256 F.Supp.2d at 919 (E.D.Wis.2003) ("[T]he defendant worthy of such a departure [based on cultural assimilation] will have been motivated to re-enter because he wishes to be with his family in the United States and otherwise been 'assimilated' into this country."). Rivas's motivation for the illegal reentry was not a prior assimilation to our culture; instead, his motive in

returning appears to have mirrored that of most immigrants who enter our country without inspection, i.e., a desire to secure and enjoy a higher standard of living. Like other undocumented immigrants who may evade our law enforcement for years, Rivas, after his illegal reentry, may have developed social, economic, and cultural ties to the United States. However, this inevitable fact cannot alone justify a downward departure for cultural assimilation. The potential basis in *Lipman* for cultural assimilation predated the alien's illegal reentry. Lipman had argued that he reentered the United States illegally to visit his disabled daughter and to live with family whom he had here at the time he reentered.

*Lipman* suggested that a departure for cultural assimilation, like a departure for family ties, could be granted only "in extraordinary circumstances." 133 F.3d at 730. Following this correct principle, we do not think the cultural assimilation ground for departure can properly be stretched to cover cases unlike *Lipman* where the asserted cultural assimilation arises primarily after the illegal reentry.

Rivas does not argue that he came to the United States because he wanted to be reunited with a wife and family that he did not then have, and of course such an argument could not be presented. Rather, Rivas contends that his "continued presence" in the United States over a lengthy period of time created bonds that assimilated him into our country by the time he was to be sentenced. Rivas thus maintains that the district court properly departed downward in sentencing him for the crime of illegal reentry. His argument relies, in part, on his interpretation of the latter portion of our statement in *Lipman:* "[C]ultural assimilation may be relevant ... if a district court finds that a defendant's unusual cultural ties to the United States—rather than ordinary economic incentives—provided the motivation for the defendant's illegal reentry *or continued presence in the United States.*" 133 F.3d at 731 (emphasis added). The facts in *Lipman* involved an immigrant's reentry after his ties in the United States had already been established, not an immigrant who had extended his illegal stay in the United States by skillfully evading capture. To the extent that the *Lipman* court may have addressed the potential propriety of departing downward based merely on the fact that an illegal immigrant enjoyed an extended illegal sojourn—which resulted in the corresponding creation of cultural and community bonds—we view such an interpretation as unpersuasive dictum, and we decline to adopt this extension of *Lipman,* for to do so would contravene its basic rationale. We hold that as a matter of law a potential downward departure for cultural assimilation was not available for Rivas under the circumstances of this case.

Having concluded that the district court erred when it departed downward based on cultural assimilation, we do not reach or address the district court's second ground for departure, based on family ties, and we express no view on whether and to what extent the departure might properly have been made on that ground. We do not address this issue because we cannot divine whether the district court would have departed and how it would have fashioned Rivas's reduced sentence absent the district court's erroneous reliance on cultural assimilation. It is for the district court in the first instance to decide whether and to what extent Rivas was entitled to a downward departure based solely on family ties. We **REVERSE** and **REMAND** to allow the district court to resentence Rivas, if

and when it may become appropriate,[4] consistent with this opinion.

**4.** We express no opinion about whether Rivas, who has been deported, may be re-sentenced *in absentia.*