**UNITED STATES of America,**
**Plaintiff–Appellant,**

v.

**Ernesto RIVAS–GONZALEZ,**
**Defendant–Appellee.**

**No. 03–30167.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 3, 2003.

Filed April 22, 2004.

Amended Sept. 27, 2004.

William Mercer (argued), United States Attorney, Billings, Montana, for the plaintiff-appellant.

Melissa Harrison (argued), Assistant Federal Defender, David Avery, Research Attorney, Federal Defenders of Montana, Missoula, Montana, for the defendant-appellee.

Before: KLEINFELD, GOULD, and TALLMAN, Circuit Judges.

### ORDER

The Opinion filed April 22, 2004, and found at 365 F.3d 806, is hereby amended as follows:

(1) We delete the last paragraph reading:

> Having concluded that the district court erred when it departed downward based on cultural assimilation, we do not reach or address the district court's second ground for departure, based on family ties, and we express no view on whether and to what extent the departure might properly have been made on that ground. We do not address this issue because we cannot divine whether the district court would have departed and how it would have fashioned Rivas's reduced sentence absent the district court's erroneous reliance on cultural assimilation. It is for the district court in the first instance to decide whether and to what extent Rivas was entitled to a downward departure based solely on family ties. We REVERSE and REMAND to allow the district court to resentence Rivas, if and when it may become appropriate,[4] consistent with this opinion.

(2) We add the following paragraph in its place at the end of the Opinion:

> Having concluded that the district court erred when it departed downward on the ground of cultural assimilation, we do not reach or address the district court's second ground for departure, based on family ties. The record is not sufficiently developed for us to conclude that the district court's departure could be sustained on that ground, and we express no view in that regard. On the record as it now stands, however, we conclude that Rivas's reduced sentence is "too low" within the meaning of 18 U.S.C. § 3742(f)(2)(B), and we accordingly **REVERSE** and **REMAND** to allow the district court to determine whether and to what extent Rivas is entitled to a downward departure based solely on family ties, and to re-sentence Rivas, if and when it may become appropriate,[4] consistent with this opinion.

The text of footnote 4 states, as prior footnote 4 stated, before this amendment, "We express no opinion about whether Rivas, who has been deported, may be re-sentenced in absentia."

The parties previously have not filed any petition for rehearing or petition for rehearing en banc. A *sua sponte* en banc call was made by a judge on this Court, and a majority of active judges did not vote for en banc review. The parties may, within twenty-one days of the filing of this order, file a petition for rehearing or rehearing en banc solely with regard to the substantive amendment above.

**IT IS SO ORDERED.**

PREGERSON, Circuit Judge, with whom Judges REINHARDT and THOMAS join, and with whom Judge WARDLAW also joins but for the reasons stated in her separate concurrence, dissenting from the court's denial of

rehearing en banc:[1]

I respectfully dissent from the order denying rehearing en banc. The panel's decision in this case conflicts with the Sentencing Guidelines, the Supreme Court's pronouncements in *Koon v. United States,* 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996), and the law of our circuit.

This case is about whether the district court had discretion to consider the cultural ties that Defendant Ernesto Rivas–Gonzalez ("Rivas") developed after his illegal reentry and which might mitigate his continued illegal presence in this country. We had already answered that question in *United States v. Lipman,* 133 F.3d 726 (9th Cir.1998), when we explained that a § 5K2.0 downward departure in an 8 U.S.C. § 1326(a) illegal reentry case may be appropriate "if a district court finds that a defendant's unusual cultural ties to the United States—rather than ordinary economic incentives—provided the motivation for the defendant's illegal reentry *or continued presence in the United States.*" *Id.* at 731 (emphasis added). Of course, the panel in this case thought otherwise. The panel opinion expresses what appears to be disdain for *Lipman's* recognition that a cultural assimilation downward departure may be appropriate in such a case, calling it "unpersuasive dictum." *United States v. Rivas–Gonzalez,* 365 F.3d 806, 812 (9th Cir.2004).

Whether the panel is correct that *Lipman's* recognition of the availability of post-illegal reentry cultural assimilation was "dictum," labeling it as such cannot mask the panel's error of law. Even if one accepts that the panel in this case was not bound by *Lipman,* the restrictions that the panel imposes on a district court's discretion to depart downward in illegal reentry cases are unwarranted, unwise, and most importantly, contrary to binding precedent.

"Sentencing is a case-by-case matter." *United States v. Defterios,* 343 F.3d 1020, 1023 (9th Cir.2003) (citations omitted). "Under U.S.S.G. § 5K2.0 and its implementing statute, a departure is appropriate when 'there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines.'" *Lipman,* 133 F.3d at 729–30 (citing 18 U.S.C. § 3553(b)).

> In determining whether a departure is warranted under U.S.S.G. § 5K2.0, a sentencing court "may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law." U.S.S.G. § 1B1.4. Except for those factors categorically proscribed by the Sentencing Commission as a basis for departure, e.g., race, sex, and national origin, the Guidelines " 'place essentially no limit on the number of potential factors that may warrant departure.'" [*United States v.*] *Mendoza,* 121 F.3d [510,] 513 [ (9th Cir. 1997) ] (quoting *Koon* [*v. United States* ], 518 U.S. [81, 106, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996)] ). If a factor has not been categorically excluded by the Sentencing Commission, a sentencing court has no authority to decide to exclude it as a matter of law.

*Id.* at 730.

The panel's holding that a district court may *never* depart downwardly on the basis of an illegal reentrant's cultural assimilation—however strong—that takes place *after* an individual's illegal reentry, *see Rivas–Gonzalez,* 365 F.3d at 812, stands in

---

1. Judge B. FLETCHER, who cannot qualify as a dissenter to the outcome, expresses her

agreement with Judge Pregerson.

stark contrast to the Supreme Court's binding statements in *Koon* and our court's binding statements in *Koon's* progeny. Under those precedents, we may not create a rule that prohibits a district court from *ever* considering a request for a certain downward departure, such as the § 5K2.0 cultural assimilation departure at issue in this case, on a categorical basis. Rather, our job requires us to trust that a district court will properly evaluate a particular defendant's request for a downward departure and determine whether the evidence he or she presents makes the case "unusual enough for it to fall outside the heartland of cases in the [applicable] Guideline." *Koon,* 518 U.S. at 98, 116 S.Ct. 2035. Of course, we are free to reverse that case-specific determination on appeal, *see* 18 U.S.C. § 3742(e), but our task, like the district court's, is to evaluate the case on a case-by-case basis, *see, e.g., Defterios,* 343 F.3d at 1023.

Nor is the panel correct that recognition of a downward departure on the basis of post-reentry cultural assimilation rewards the reentrant for "enjoy[ing] an extended illegal sojourn—which resulted in the corresponding creation of cultural and community bonds." *Rivas–Gonzalez,* 365 F.3d at 812. While the conventional wisdom is that unauthorized immigrants will always remain in this country once they have managed to get here, that is not in fact the case. Estimates by the former INS show that during the 1990s, anywhere between 111,000 and 183,000 undocumented immigrants left the country voluntarily *each year.* Office of Policy and Planning, Immigration and Naturalization Service, Estimates of the Unauthorized Immigrant Population Residing in the United States: 1990–2000 at 10, *available at* http:// uscis.gov/graphics/shared/aboutus/statistics/Ill_Report_1211.pdf. By contrast, the number of individuals removed by the INS during that period varied from 26,000 to 63,000 per year. *See id.*

Perhaps even more troubling is the panel's holding that a district court may *never* consider even *pre*-reentry cultural assimilation unless the defendant was "brought to the United States as [a] child[ ]." *Rivas–Gonzalez,* 365 F.3d at 811. I have no doubt that the most compelling cases for a downward departure will involve a defendant who came to the United States as a child, but I see no reason for—and the Guidelines, the Supreme Court, and the law of this circuit prohibit—a per se rule that only illegal reentrants "brought to the United States as children," *see id.,* are eligible for a cultural assimilation downward departure. Consider the case of an individual who came to the United States when she was twenty-one years old, spent over twenty-five years in this country, had children and grandchildren here, and was then ordered deported. These facts are not entirely hypothetical. In *Martinez-de Bojorquez v. Ashcroft,* 365 F.3d 800 (9th Cir.2004), the petitioner illegally arrived in this country in 1972 at age twenty-one and eventually become a permanent resident. In 1998, the BIA ordered her deported because of her attempt to smuggle a cousin into the country. Under *Rivas–Gonzalez,* if that person were to return to the country illegally and then be convicted of violating 8 U.S.C. § 1326, the district court could not even consider whether a downward departure would be appropriate on the basis of cultural assimilation.

In an exceptional case, a district court should be allowed to find that a § 1326(a) defendant would not have stayed in this country but for his or her unusual cultural ties. In such a case, a district court should have the discretion to consider a § 5K2.0 downward departure. That is precisely what the district court did in this case when it departed downwardly on Rivas' sentence. The district court found that the evidence of Rivas' "character and conduct," U.S.S.G. § 1B1.4, established

that his cultural ties motivated his continued presence in the United States. The district court's comments at sentencing bear repeating because they best illustrate the injustice, I respectfully submit, committed by the panel to Rivas and other similarly-situated reentrants. "The district court said that Rivas's case was 'the most extraordinary of any of these illegal alien cases that I have seen in seven years on the bench.' " *Rivas–Gonzalez*, 365 F.3d at 808.

> [T]he district court added, "it seems to me that this is the kind of person that we want to have living in this country. He's a good citizen. Even though he isn't a citizen, he contributes far more to the community. And his connections with that and his cultural assimilation into the community is far greater than many of the people who live here simply by birth."

*Id.* at 809.

Under the panel's erroneous reading of the Guidelines, of the Supreme Court's decision in Koon, and of the law of our circuit, a district court is categorically forbidden from ever considering at sentencing any cultural assimilation that developed post-reentry or even any pre-reentry cultural assimilation developed by a reentrant who was not "brought to the United States as [a] child[ ]." *Rivas–Gonzalez*, 365 F.3d at 811.

Because the panel's decision is contrary to binding law, and because it unnecessarily restricts a district court's sentencing discretion, I dissent.[2]

WARDLAW, Circuit Judge, concurring in the dissent from denial of rehearing en banc:

I join Judge Pregerson in dissent, albeit for reasons that differ from his. I believe that the decision is unclear as to the breadth of its holding and that it would have been prudent to rehear this case to clarify the law of our circuit. Since the decision can be read in two different ways, either as a broad, categorical rule or as a narrow, fact-specific holding, it leaves courts and litigants with mixed signals and little direction. Once again we leave an area of immigration law murkier than before.

To the extent the panel categorically ruled out cultural assimilation as a basis for downward departure unless the defendant was brought to the United States as a child, it disregarded the law of this circuit in *United States v. Lipman*, 133 F.3d 726

---

**2.** Because this is a sentencing case, it may be affected by the Supreme Court's forthcoming decisions in *United States v. Booker*, 375 F.3d 508 (7th Cir.2004), *cert. granted*, — U.S. ——, 125 S.Ct. 11, — L.Ed.2d ——, 2004 WL 1713654 (Aug. 2, 2004), and *Fanfan v. United States*, 2004 WL 1723114 (D.Me. June 28, 2004), *cert. granted*, — U.S. ——, 125 S.Ct. 12, — L.Ed.2d ——, 2004 WL 1713655 (Aug. 2, 2004). The second question presented in both of these appeals involves whether "the Sentencing Guidelines as a whole would be inapplicable, as a matter of severability analysis, such that the sentencing court must exercise its discretion to sentence the defendant within the maximum and minimum set by statute for the offense of conviction." Pet. for Cert. at *I, *Booker, available at* 2004 WL 1638204; Pet. for Cert. at *I, *Fanfan, avail-*

*able at* 2004 WL 1638205. Should the Court answer this question in the affirmative—that is, rule that the Sentencing Guidelines are unconstitutional as a whole—sentencing would be conducted as it was "before the guidelines were promulgated." *Booker*, 375 F.3d at 515 ("If the guidelines fall, the judge is free as he was before the guidelines were promulgated to fix any sentence within the statutory range."). Should our mandate be stayed in this case, or should Rivas seek a writ of certiorari, the panel's decision may very-well become moot because the district court's sentence fell within the statutory range. *See Koon*, 518 U.S. at 96, 116 S.Ct. 2035 ("Before the Guidelines system, a federal criminal sentence within statutory limits was, for all practical purposes, not reviewable on appeal.").

(9th Cir.1998), and that of the Supreme Court in *Koon v. United States,* 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996). However, the decision in *Rivas–Gonzalez* can be read more narrowly as a decision driven by the facts the panel found on its de novo review.

The lynchpin of the *Lipman* decision was the motivation for reentry—whether it was for cultural, emotional, and psychological ties to the Untied States, or whether it was for ordinary economic reasons. In the *Lipman* case, Lipman's asserted bases for a cultural assimilation departure were simply discredited; just as, under de novo review, this panel discredited Rivas's motivations.

The panel considered many factors in reaching its conclusion:

> Rivas first came to the United States as a twenty-one year-old adult, so Rivas, unlike Lipman, *has* known another home outside of the United States. According to the PSR, Rivas speaks only some English and still has command of his native Spanish, with skills in reading, writing, and speaking that language. Before being deported the first time, Rivas had lived most of his life in Mexico. When he reentered the United States illegally for the second time, Rivas had not yet met his American wife, nor had he fathered his two American children.

*U.S. v. Rivas–Gonzalez,* 365 F.3d 806, 811 (9th Cir.2004). Indeed, the *Rivas–Gonzalez* panel inspected Rivas's motive for entering the country, as *Lipman* instructed: "Rivas's motivation for the illegal reentry was not a prior assimilation to our culture; instead, his motive in returning appears to have mirrored that of most immigrants who enter our country without inspection, i.e., a desire to secure and enjoy a higher standard of living." *Id.* at 811–12.

The *Rivas–Gonzalez* panel qualified each of the two statements of its holdings.

First it held: "[W]e do not think the cultural assimilation ground for departure can properly be stretched to cover cases unlike *Lipman* where the asserted cultural assimilation arises *primarily* after the illegal entry." *Id.* at 812 (emphasis added). Second, emphasizing that any cultural ties Rivas enjoyed with the United States was a result of his "skillfully evading capture," it narrowly held: "We hold that as a matter of law a potential downward departure for cultural assimilation was not available for Rivas *under the circumstances of this case.*" *Id.* at 812 (emphasis added). Thus, *Rivas–Gonzalez* is carefully limited to the circumstances of Rivas's case.

I agree that a person who arrives as a child and grows up in the United States presents the most compelling case for a cultural assimilation downward departure, but I also believe that *Rivas–Gonzalez* does not foreclose a similar departure for a person who arrives as a 21 year-old adult, who then spends 25 years in this country, has a spouse, children, and grandchildren, is ordered deported and then returns. Thus, to the extent the panel limited its decision to the facts of the *Rivas–Gonzalez* case, it retained the case-by-case sentencing mandated by the Guidelines. Given the de novo review standard enacted by Congress in the PROTECT Act, it would seem that, just like the district court and panel here, the same facts might lead to another conclusion in a different case.

If *Rivas–Gonzalez* were a categorical holding barring any consideration of cultural assimilation that takes place after an individual's illegal reentry, it would be contrary to the precedent of this circuit and the Supreme Court. I write separately because I believe the opinion should be read as a fact-specific holding. Therefore this circuit is left in confusion as to the meaning of the panel's decision in *Rivas–Gonzalez* and its reconciliation with *Lip-*

*man.* This confusion should have been addressed by a rehearing en banc.

## OPINION

GOULD, Circuit Judge:

The United States appeals a decision of the district court to depart downward by eight levels in sentencing an alien who was charged with illegal reentry after having been previously removed. We have jurisdiction under 18 U.S.C. § 1291 and we reverse.

## I

Ernesto Rivas–Gonzalez ("Rivas") is a forty-five year old Mexican national who first entered the United States illegally in 1979 at age twenty-one. On January 8, 1993, almost fifteen years after his first illegal entry, he was sentenced in state court in Yakima, Washington, to a prison term of one year and one day on a drug-related violation. He served the sentence and was thereafter deported to Mexico on July 24, 1993.

Rivas has admitted that soon after he was deported to Mexico in 1993, he reentered the United States illegally without inspection and began living again in Yakima, Washington. There, he met an American citizen named Terry Rivas, whom he married on February 12, 1995. Rivas and his wife later had two American-born daughters.

The government learned of Rivas's illegal status from an anonymous source. Rivas was taken into custody on September 12, 2002. He was charged with reentering the United States without inspection after having been previously deported in violation of 8 U.S.C. § 1326(a). On December 11, 2002, Rivas pleaded guilty. The Presentence Investigation Report ("PSR"), to

which neither party objected, computed Rivas's total offense level at seventeen. His criminal history category was II because of his prior arrest and term of imprisonment. Rivas's resulting guideline sentencing range was 27–33 months. The probation officer in the PSR said that he was unaware of information that would indicate that a departure was warranted in Rivas's case.

Rivas filed a Sentencing Memorandum requesting a five-level downward departure (from seventeen to twelve), which would reduce the sentence range from 27–33 months to 12–18 months. Rivas asked for a 12–month sentence, arguing that his cultural assimilation into United States society and his family ties in this country justified a shorter sentence.

Over the government's expressed objections, the district court granted Rivas's request. Although the district court did not explicitly differentiate between cultural assimilation and family ties when it articulated its reasons for departing, the district court explained why, in its view, the case stood "outside the heartland" of cases governed by the Sentencing Guidelines. *Koon v. United States,* 518 U.S. 81, 109, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996). The district court said that Rivas's case was "the most extraordinary of any of these illegal alien cases that I have seen in seven years on the bench." Among other things, the court recognized that numerous letters submitted at sentencing on behalf of Rivas's family and members of the Butte, Montana community, attested to Rivas's positive integration into the community and commended his character;[1] that Rivas was employed in construction, as opposed to agriculture, and

---

1. To illustrate, the letters described Rivas as "a hard working upstanding citizen," "a good man who would go out of his way to help someone in need," "a responsible father, hus-

band, and provider for his family," "a dependable employee ... [who] works well with others," and "very devoted to his wife and children."

had received accolades for his job performance; that Rivas was married and in a stable relationship; that Rivas expressed an exceptional degree of love and care for his children; that he speaks English, the predominant language used in his family's home; that Rivas's four siblings legally resided in the United States; and that Rivas had not "simply popped across the border," but rather, he had been living in the United States for some time before being deported. The district court also noted that after Rivas's wife Terry became permanently disabled in 1997, Rivas had served as the family's sole provider, and that only after Rivas's arrest was the family forced to resort to public assistance.

At Rivas's sentencing, moved by the cumulative grounds for leniency in this case, the district court added, "it seems to me that this is the kind of person that we want to have living in this country. He's a good citizen. Even though he isn't a citizen, he contributes far more to the community. And his connections with that and his cultural assimilation into the community is far greater than many of the people who live here simply by birth."

Thus motivated, the district court departed by eight levels (from seventeen to nine), which even exceeded by three levels the degree of departure that Rivas had requested. The district court sentenced Rivas to six months in prison and two years of supervised release. Rivas served his sentence and was remanded to the custody of the U.S. Immigration and Naturalization Service, whereupon he was deported to Mexico. Rivas's daughters continue to live with their mother Terry in the United States. On legal grounds, the government challenges the district court's decision to depart and the extent of the contested departure.

## II

### A

■ This case is not moot despite that Rivas has been deported. Were Rivas to reenter the United States, he would be required to comply with the conditions of his yet unserved two-year term of supervised release. That the likelihood of Rivas's reentry into the United States is speculative is of no moment. *United States v. Valdez–Gonzalez*, 957 F.2d 643, 647 (9th Cir.1992) (noting that the Supreme Court has allowed speculative contingencies to prevent mootness, and holding that "[b]ecause ... the government could seek the extradition of [defendants] or because [defendants] could face further proceedings in this case upon reentering the country, the appeal is not moot.") (citing *United States v. Villamonte–Marquez*, 462 U.S. 579, 581, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983)), *abrogated on other grounds as noted by United States v. Webster*, 996 F.2d 209, 211 (9th Cir.1993).

### B

■ The district court sentenced Rivas before Congress passed the Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today Act of 2003 ("PROTECT Act"), Pub.L. No. 108–21, 117 Stat. 650. The PROTECT Act alters our standard of review from abuse of discretion to de novo in cases where the district court departed from the otherwise applicable Guidelines range. In *United States v. Phillips*, 356 F.3d 1086, 1098–1099 (9th Cir.2004), we held that "the PROTECT Act's new standard of review applies to cases pending on appeal at the time of its enactment." *See also United States v. Daychild*, 357 F.3d 1082, 1106 (9th Cir. 2004). Following *Phillips*, we apply the standard of review required by the PROTECT Act under 18 U.S.C. § 3742(e), and

we review de novo the district court's decision to depart downward in fashioning Rivas's sentence.

## C

■ The government contends that the district court erred when it departed downward on the basis of cultural assimilation. The district court relied on our precedent in *United States v. Lipman,* 133 F.3d 726 (9th Cir.1998), in which we held, without any prior federal authority, that a sentencing court has the authority under U.S.S.G. § 5K2.0 to consider evidence of cultural assimilation.[2] We explained in *Lipman:*

> cultural assimilation may be relevant to sentencing under U.S.S.G. § 2L1.2 [governing unlawful reentry] if a district court finds that a defendant's unusual cultural ties to the United States—rather than ordinary economic incentives—provided the motivation for the defendant's illegal reentry or continued presence in the United States. Cultural assimilation may also be relevant to the character of a defendant sentenced under U.S.S.G. § 2L1.2 insofar as his culpability might be lessened if his motives were familial or cultural rather than economic.

133 F.3d at 731. We also declared that "to the extent that cultural assimilation denotes family and community ties, we hold that the district court has the authority to depart on this basis in extraordinary circumstances." *Id.* at 730.

No published opinion from our circuit has discussed in further detail the scope or character of the cultural assimilation departure ground set forth in *Lipman.* However, courts in other jurisdictions have cited *Lipman* for the proposition that a sentencing court may take into account a defendant's degree of cultural assimilation when it considers whether to depart downward. *See, e.g., United States v. Rodriguez-Montelongo,* 263 F.3d 429, 432 (5th Cir.2001) (holding that cultural assimilation is a permitted ground for departure); *United States v. Sanchez-Valencia,* 148 F.3d 1273 (11th Cir.1998) (holding that sentencing judge was aware of his authority to depart in light of *Lipman* ); *United States v. Reyes-Campos,* 293 F.Supp.2d 1252, 1257 (M.D.Ala.2003) ("This court ... has no difficulty concluding that it has the authority to depart downward based on ... cultural assimilation to the United States."); *United States v. Martinez-Alvarez,* 256 F.Supp.2d 917, 920 (E.D.Wis.2003) (laying out four-factor test for determining cultural assimilation).[3]

In *Lipman,* we addressed whether the district court was aware of its discretion to depart based on cultural assimilation grounds. We decided that while the district court properly considered cultural assimilation as a permissible ground for departure, we lacked jurisdiction to review and second-guess the district court's discretionary decision not to grant a downward departure. Thus in *Lipman,* though

**2.** 18 U.S.C. § 3553(b) is the implementing statute of U.S.S.G. § 5K2.0. The statute states that a departure is appropriate where "there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." The defendant bears the burden of proving by a preponderance of the evidence that the circumstances of his or her case warrant a downward departure. *United*

*States v. Anders,* 956 F.2d 907, 911 (9th Cir. 1992).

**3.** The Eighth Circuit in *United States v. Aguilar-Portillo,* 334 F.3d 744, 749 (8th Cir.2003), raised cultural assimilation as a possible ground for departure, but stopped short of recognizing it as a proper ground, holding, "[e]ven if we agreed with the principle established in *Lipman,* we think that a departure was not appropriate here."

relief was not given on this ground, we established cultural assimilation as a permissible ground for departure. *Lipman* illuminates the basis for this theory of departure, which was judge-made, not designated by the legislature.

Lipman, a Jamaican citizen, had been brought to the United States by his family at age twelve; he lived here legally for twenty-three uninterrupted years; he attended public schools in the United States through high school; he married a United States citizen; he fathered seven American-born children; and his entire family, including his mother, siblings, children, and wife, all lived in the United States as American citizens. *Lipman*, 133 F.3d at 729. Regrettably, however, Lipman was not satisfied with the opportunity for a better life here without crime, and instead, went astray and was convicted of several felonies. These prompted his deportation. After being deported, Lipman returned illegally without permission of the Attorney General. After being charged and convicted, he argued at sentencing that his cultural assimilation mitigated his culpability for the crime of illegal reentry, because he had been motivated to reenter by "cultural, emotional, and psychological ties" to the United States. *Id.* Lipman also argued that deporting him would cause him greater hardship than it would cause most illegal reentry defendants because the United States was effectively his homeland. *Id.* Nonetheless, the district court in *Lipman* declined to depart, and one reason given was that Lipman was not credible because he claimed to have returned to visit his disabled daughter in New York who had been sexually assaulted, but after his illegal reentry he had traveled to Los Angeles instead. On these facts, we held in *Lipman* that cultural assimilation was a permissible ground for departure, but that in Lipman's case we would not review the district court's discretionary decision not to depart.

Under *Lipman*, cultural assimilation remains a proper basis for granting a downward departure in 8 U.S.C. § 1326 cases for persons brought to the United States as children, who had adapted to American culture in a strong way and who, after deportation, returned to the United States for cultural rather than economic reasons. The district court here incorrectly expanded *Lipman's* reach to an inapposite set of facts that go beyond *Lipman's* proper scope and rationale. Rivas first came to the United States as a twenty-one year-old adult, so Rivas, unlike Lipman, *has* known another home outside of the United States. According to the PSR, Rivas speaks only some English and still has command of his native Spanish, with skills in reading, writing, and speaking that language. Before being deported the first time, Rivas had lived most of his life in Mexico. When he reentered the United States illegally for the second time, Rivas had not yet met his American wife, nor had he fathered his two American children. *Cf. United States v. Martinez–Alvarez*, 256 F.Supp.2d at 919 (E.D.Wis.2003) ("[T]he defendant worthy of such a departure [based on cultural assimilation] will have been motivated to re-enter because he wishes to be with his family in the United States and otherwise been 'assimilated' into this country."). Rivas's motivation for the illegal reentry was not a prior assimilation to our culture; instead, his motive in returning appears to have mirrored that of most immigrants who enter our country without inspection, i.e., a desire to secure and enjoy a higher standard of living. Like other undocumented immigrants who may evade our law enforcement for years, Rivas, after his illegal reentry, may have developed social, economic, and cultural ties to the United States. However, this inevitable fact cannot alone justify a downward departure for cultural assimilation. The potential basis in *Lipman* for cultural

assimilation predated the alien's illegal reentry. Lipman had argued that he reentered the United States illegally to visit his disabled daughter and to live with family whom he had here at the time he reentered.

*Lipman* suggested that a departure for cultural assimilation, like a departure for family ties, could be granted only "in extraordinary circumstances." 133 F.3d at 730. Following this correct principle, we do not think the cultural assimilation ground for departure can properly be stretched to cover cases unlike *Lipman* where the asserted cultural assimilation arises primarily after the illegal reentry.

Rivas does not argue that he came to the United States because he wanted to be reunited with a wife and family that he did not then have, and of course such an argument could not be presented. Rather, Rivas contends that his "continued presence" in the United States over a lengthy period of time created bonds that assimilated him into our country by the time he was to be sentenced. Rivas thus maintains that the district court properly departed downward in sentencing him for the crime of illegal reentry. His argument relies, in part, on his interpretation of the latter portion of our statement in *Lipman:* "[C]ultural assimilation may be relevant . . . if a district court finds that a defendant's unusual cultural ties to the United States—rather than ordinary economic incentives—provided the motivation for the defendant's illegal reentry *or continued presence in the United States.*" 133 F.3d at 731 (emphasis added). The facts in *Lipman* involved an immigrant's reentry after his ties in the United States had already been established, not an immigrant who had extended his illegal stay in the United States by skillfully evading capture. To

the extent that the *Lipman* court may have addressed the potential propriety of departing downward based merely on the fact that an illegal immigrant enjoyed an extended illegal sojourn—which resulted in the corresponding creation of cultural and community bonds—we view such an interpretation as unpersuasive dictum, and we decline to adopt this extension of *Lipman,* for to do so would contravene its basic rationale. We hold that as a matter of law a potential downward departure for cultural assimilation was not available for Rivas under the circumstances of this case.

Having concluded that the district court erred when it departed downward on the ground of cultural assimilation, we do not reach or address the district court's second ground for departure, based on family ties. The record is not sufficiently developed for us to conclude that the district court's departure could be sustained on that ground, and we express no view in that regard. On the record as it now stands, however, we conclude that Rivas's reduced sentence is "too low" within the meaning of 18 U.S.C. § 3742(f)(2)(B), and we accordingly **REVERSE** and **REMAND** to allow the district court to determine whether and to what extent Rivas is entitled to a downward departure based solely on family ties, and to re-sentence Rivas, if and when it may become appropriate,[4] consistent with this opinion.

---

**4.** We express no opinion about whether Rivas, who has been deported, may be re-sentenced *in absentia.*